JOHN W. HILL, Respondent, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—No. 40558.—216 S. W. (2d) 487.

Court en Banc, December 13, 1948.

Rehearing Denied, January 7, 1949.

598

*Warner Fuller* and *Arnot L. Sheppard* for appellant.

*Charles P. Noell* for respondent; *R. L. Sutton* and *John H. Haley, Jr.,* of counsel.

[488] DALTON, C.—Action for damages for personal injuries under the Federal Employers' Liability Act. The jury returned a verdict for plaintiff for $37,721, a remittitur was required in the sum of $12,721 and judgment was entered for plaintiff for $25,000. Defendant has appealed.

Respondent, a switchman employed by appellant, received an injury to his right foot while attempting to board a cut of moving cars in

appellant's Tenth Street yard in St. Louis, Missouri. The cause was submitted to the jury on appellant's alleged negligence in failing to furnish respondent a reasonably safe place in which to work.

Appellant's theory is that no duty required respondent to go to the point at which he attempted to board the cars or to board the cars from the bottom of the ditch adjacent to the track upon which the cars were moving; that the ditch was not intended for such use, nor furnished as a place from which to board moving cars; that a safe place was furnished, where grain doors covered the ditch further north, or where the ground was level further south; and that respondent was injured as the direct result of his sole gross negligence in choosing a dangerous place to board the cars, when a safe place was provided.

Error is assigned on the court's action in refusing to direct a verdict for appellant, on the giving of respondent's instruction I, on the permitting of certain arguments by counsel for respondent and on an alleged excessive verdict. We will consider the first two assignments together, since it is contended (1) that, under the evidence, no duty rested upon appellant to exercise ordinary care to make the bottom of the ditch reasonably safe for use as a place from which to attempt to board moving cars; (2) that respondent's negligence, as stated, was the sole proximate cause of his injury; and (3) that instruction I is not supported by any evidence "for the reason that it predicates a 'duty . . . to go upon that part of defendant's' premises 'west of the first track east of a wall on the west side of said yard and immediately south of a platform or grain door . . . and there to get on a train.' "

Appellant's Tenth Street yard extends north and south and the tracks pass through a tunnel under Washington Avenue near Eighth and Spruce. The first track on the west side is referred to as the Tenth Street lead. After this track emerges from the south end of the tunnel, two switch tracks branch off to the right or west, the first is referred to as the Hill track and the second is referred to as the House track. Adjacent to the west end of the ties, at the place where the Hill track leaves the Tenth Street lead, there is a small ditch or depression, 16 to 18 inches in depth and perhaps a little wider, extending some thirty-five feet along the west side of these tracks. On the west side of this ditch is a low rock retaining wall. The ditch had been in existence for some five years. The purpose of this ditch was to carry off surface water and prevent the water from overflowing the tracks, bringing in drift and fouling the switch points between the Tenth Street lead and the Hill track. Further north on this ditch, near the south end of the tunnel, there are catch basins into which the water from the ditch drains. There was evidence that this surface water could have been drained into catch basins further south and the ditch covered or dispensed with.

The switch located at the intersection of the Hill track and the Tenth Street lead is referred to as the Hole (or tunnel) switch and it is controlled from a point over the ditch on the west side of the Tenth Street lead. On the south side of the switch lever is a platform or grain door covering the ditch. The platform is 7 feet long (north and south) and about the width of the ditch (east and west). On the north side of the switch lever is a grain door or platform about half as long as on the south, since the grain door extends east and west. The east side of the grain door platform rests upon the west end of the ties at the intersection of the Hill track and Tenth Street lead. The grain doors had not been there as long as the ditch.

The switch stand for the House track is located on the east side of the Tenth Street lead. This stand is about three car lengths according to respondent's evidence (73 feet according to appellant's evidence) south of the Hole switch. On the west side [489] of the Tenth Street lead and a little beyond the House track switch is a pot (or dwarf) signal stand by which a signal can be given to the enginemen, when the engine is in the tunnel. This stand is between the Hill track and the Tenth Street lead.

About 7:45 p. m., on April 25, 1946, respondent was working with a crew of four men. A switch engine headed south, but with four cars in front of it, had backed north off of the Hill track onto the Tenth Street lead and into the tunnel. Respondent had gotten off the rear of the fourth car at the Hole switch and had lined it, since the two rear cars were to be placed on the House track. Another member of the crew lined the switch at the House track. When the cars came out of the tunnel, respondent got on the south end of the second car from the engine to cut off the rear two cars intended for the House track. He got on the car from the grain door platform. After the two cars were released on the House track, the engine and remaining two cars moved north into the tunnel. Respondent got off opposite the House track switch, crossed the Tenth Street lead and lined the switch, since the second car from the engine was intended for the Tenth Street lead.

After respondent lined the switch, another crew member using the "pot" signal, signalled for a kick. When respondent lined the switch, he ran northwest, at an angle, across the Tenth Street lead and the lower end of the Hill track and north, down the ditch, heading for the platform at the Hole switch to catch the cut of cars. He intended to get on the south end of the car next to the engine as it was being shoved south, and to catch it before the cars got up too much speed. He ran down to get on at the Hole switch platform because the cars would pick up speed so fast it would be impossible to get on where he was. Except for the speed of the cars, he could have lined the House track switch, crossed the Tenth Street lead and gotten on at

that point, "if he had wanted to walk in the rail there between the ties." However, that location "doesn't give you any clearance between the pot signal and the rail." The distance of the pot signal stand from the west rail of the Tenth Street lead is shown only by pictures.

Respondent was on the way, running, when the movement started, but he could not make the platform. He got to within one step of the south end of the grain door platform at the Hole switch, when the end of his car (the south end of the car next to the engine) reached and was passing him at a speed of about 8 miles per hour. The purpose of the movement was to kick off the south car, and it was respondent's duty to pull the pin and release this car. Respondent was in the ditch, his knees were below the tops of the ties, he intended to get on by putting his left foot in the metal stirrup that extended down about eighteen inches below the car floor and by taking hold of the grab irons above the stirrup, or by taking hold of a grab iron and bringing his left foot into the stirrup. The cars and engine were moving south, plaintiff was facing east and he extended his left foot "towards the way the movement was coming." When respondent brought his left foot up to take the stirrup, his foot caught under the south edge of the grain door platform over the ditch. He was thrown off balance and he was falling under the car, when he caught a grab iron and held on, but a wheel passed over a part of his right foot.

When respondent attempted to get on the car, it was dark and he couldn't see how close he was to the platform, but he was within one step of it. Later, respondent testified: "The light had nothing to do with my accident, because I had my bearings and I knew where I was at." The ditch being lower "caused me to catch a hold on a lower rung on the side of the car than ordinarily. If I had been on the level footing I would have caught a higher rung and I would have had leverage and could probably avoided the accident."

Respondent was an experienced switchman and he was carrying a switchman's signal lantern with a focusing beam. He was well acquainted with the situation in the vicinity of the Hole switch and he knew what the movement was and what to expect. It was the usual switching movement that was made practically every night. Respondent [490] also knew of the ditch and of its purpose "to keep two-by-fours and overflow water out of the switch point."

Without objection, respondent testified: "Q. Was it your duty to get on the car as it moved there? A. Yes, sir, it was. . . . Q. Was it your duty to get on the car in that particular place? A. Yes. Q. How so? A. If I would have waited until he came to me, I couldn't have got on at all, because the speed would have been so great I couldn't have got on the cars, so I had to run down there in the

ditch in order to get on, it was a place we all got on at more or less. . . . Q. Was it your duty to get on this car while it was moving? A. Yes, sir.''

If respondent had missed getting on the car, he would have had to signal a stop when the engine got out of the tunnel so the enginemen could see his signal, and he would then have had to walk south some two car lengths and get on. This would have occasioned a delay of about five minutes on this movement. Time was important, because the assigned work was to be done. Respondent said: "You are expected to do it, or tell why you didn't do it in eight hours. . . . I was trying to give the company the grade of service they were paying me for.''

Respondent further testified (appellant relies particularly on this portion of his testimony): "Q. Were you walking or running? A. I was stepping along, I would say, you would call it running. I intended to get on that grain door to catch the car as it was coming toward me. Q. You intended to get on the car from the platform? A. Yes, sir. Q. That is what the platform had been put there for? A. *Yes, in a way.* You have to have something like that *to get off.* Q. Sure? A. Because it drops down there. Q. That is why that platform was put there? A. *To give us a little lift and help out some.* Q. It was put there so you could throw the switch, put there so that you could get on and off cars from the platform? A. Yes, sir. Q. And were you going to this platform for the purpose of having a reasonably safe footing to get on the train? A. That is right. Q. You knew that the signal for the movement toward the south had been given because you heard it? A. Yes, sir. . . . Q. Now you said further in this statement, 'This hole switch platform being level with the tops of the ties, is just a makeshift affair made out of grain doors and put there by the section men.' A. That is right. Q. 'But it was the only logical place to get on the car.' A. That is right. Q. That was the customary place for you switchmen to get on the cars? A. I did, yes. Q. You did always? A. *We would make a run for the platform and climb on the cars.* . . . Q. You say you would make a run for the platform? A. *Yes, we would have to get there before they started the kick.* Q. Why didn't you get on on this occasion? A. *It moved on ahead before I could make it to the platform.''* (Italics ours.)

Respondent's witness Weaver, foreman of the crew at the time respondent was injured, testified that it was respondent's duty to get on the car at the place respondent attempted to get on; that it was necessary for a car to be cut off; that it was respondent's duty to cut it off; and that he would first have to get on the train. Weaver further testified: "Q. What effect did that ditch have on a man getting on the grab irons on the side of the box car, such as Mr. Hill's duties

required him as you have testified, what effect did that have by him doing that?' A. Well, if you are standing ·down. in the ditch you would be pretty low getting on the car. Q. And just what effect would that have where you are· low? ` A. Well, you can't properly reach the step. .· . . [491] Q. And 'makes it difficult to lift your legs high to get to the stirrup? A. Yes, sir. . . . Q. What effect 'does it have? A. That puts a man down in a low position so that he almost has to pull himself up by his arms, by sheer strength in order to reach the stirrup. . . . Q. Now Mr. Weaver, isn't it customary among the switchmen there doing that kind of work to use your own judgment as to where you· board or alight from the cars while they are being switched? A. Yes, sir. Q. It is customary for switchmen to choose their own spot to get on and off moving cars? A. Yes, sir. · Q. That is correct; that is up to him, and he will pick a spot where he will have the safest footing for boarding the cars; that is true, isn't it? A. Yes, sir. . . . Mr. Weaver, is it possible at all times·to get on a moving cut of cars coming out of the tunnel, such as in evidence here, and get on those cars at a point that has been described as the platform? A. It isn't always possible, no, sir. .· . . Going toward the tunnel it would be too dangerous to get off on there except if you was on the last car.'' Mr. Weaver further testified that prior to the time of respondent's injury he had complained to Mr. Clark, supervisor of the track, ''about that·ditch and the difficulty of men getting on and off cars·there at that point.'' Mr. Weaver also gave some testimony similar to that part of respondent's testimony upon which the appellant relies.

· Respondent's witness West testified that switchmen ''at times'' got on and off cars at the grain door platform; that customarily they stood ''on that platform where you would have a decent 'footing''; and that customarily meant, ''it is done the most times.''

Owen Christy, one of the switchmen, testified that it was customary to get on and off moving cars throughout the switch yard.

As stated, appellant contends that no duty rested upon it to exercise ordinary care to make the bottom of·the ditch reasonably safe for use as a place from which to attempt to board a moving car; and that the ditch was not dug for the purpose for which respondent attempted to use it at the time he was hurt, nor was it furnished to him for such use. Appellant cites Wellinger v. Terminal Railroad Ass'n. of St. Louis, 353 Mo. 670, 183 S. W. (2d) 908, 910, stating a qualification of the general rule concerning the master's duty to provide the servant with reasonably safe appliances, towit, when the appliances are not used in the ordinary manner and for the purposes intended. Appellant further cites cases holding that the .master is not liable where the servant's use of the instrumentality or place is for a purpose not·intended or required by .the master, where the instrumentality

or place is obviously dangerous when used for the purpose or in the manner shown, and where there is no evidence of such customary use with the master's knowledge. Manche v. St. Louis Basket & Box Co., (Mo. Sup.), 262 S. W. 1021; Baltimore & Ohio R. Co. v. Newell, 196 F. 866, 868, 869; York v. Kansas City C. & S. Ry. Co., 117 Mo. 405, 411, 412, 22 S. W. 1081; Kelley v. Lawrence, 195 Mo. 75, 87, 92 S. W. 1158; Graham v. C. St. P. M. & O. Ry. Co., 62 F. 896; Freeman v. Garretts, (Tex.), 196 S. W. 506; McClain v. Seaboard Air Line R. Co., (Ga. App.), 129 S. E. 876; Campbell v. Southern Pac. R. Co., (Ore.), 250 P. 622. Appellant further says that we are not concerned with any exception based upon the customary use of the bottom of the ditch as a place from which to board cars, because all of the evidence shows there was no such custom.

Both respondent and his foreman, Weaver, testified that it was respondent's duty to board the moving car at the place from which he attempted to board it. Appellant refers to respondent's testimony as stating "a wholly unrealistic and illogical conclusion," "wholly unwarranted" and contradicted by the physical facts in evidence. Appellant contends that to uphold the conclusion "is to ignore the substance and decide the case upon a shadow." Appellant did not object to respondent stating the alleged conclusion, but did object to the foreman's testimony. The objection was [492] overruled on the theory that the foreman "knew what the duties of the rest of the crew were." It further appears from the evidence that it was not always possible to get on and off the cars at the grain door platform; that it was customary to get on and off moving cars throughout the switch yard; that the ditch itself was a place switchmen "got on at more or less"; and that appellant had knowledge of these facts. Respondent's foreman had complained to appellant's track supervisor about the ditch and the difficulty of men getting on and off cars at that point.

The mere use of that portion of the right of way for the drainage of surface water was not necessarily inconsistent with its use as a place for boarding moving cars. The evidence indicates that the ditch area was considered less hazardous than the area where the rails of the Hill track were located, or the area adjacent to the pot signal. While the evidence shows that the grain door platform was considered more suitable for use in boarding moving cars than the bottom of the ditch, and that the platform was much used for that purpose, the evidence sufficiently shows that, in the discharge of respondent's duty as a switchman, it was sometimes necessary to get on and off moving cars at the place where the ditch was located; that it was respondent's duty to use the ditch when necessary to get on the cars; and that he and the other switchmen did use the ditch for such purpose with the knowledge and acquiescence of appellant. We do not construe that

portion of respondent's testimony relied upon by appellant as necessarily in conflict with his prior testimony (note the italicized portions). There is no contention that the ditch was a reasonably safe place for respondent to work, but there is no evidence that appellant objected to its use, or promulgated any rule forbidding its use. Considering all the evidence in a light most favorable to the respondent, as we must, the evidence was sufficient to show that it was respondent's duty to go upon the ditch area for the purpose of boarding the moving car. Respondent's "fleeting or infrequent" use of the ditch did not relieve appellant of its duty to him. Bailey v. Cent. Vt. Ry., 319 U. S. 350, 353. In view of our holding, supra, it is only necessary to say that the evidence was sufficient to support the submission of the issue of respondent's duty in instruction I.

■ Appellant further insists that, in the exercise of reasonable care for his own safety, respondent "should have stood on the flat ground between the Tenth Street lead and the Hill track, where he could and would have boarded the moving car with perfect safety, or that he should have stopped the movement of the cars and boarded this car after it was stopped." Appellant argues that, as a matter of law, respondent's own gross negligence in not so doing was the sole proximate cause of his injury, in that he chose a dangerous instead of a safe place and way of boarding the moving car. Appellant cites Atlantic Coast Line v. Davis, 279 U. S. 34, 39, 73 L. Ed. 601, 603; Hogan v. New York Central & H. R. Co., 223 F. 890; A. T. & S. F. R. Co. v. Toops, 281 U. S. 351,74 L. Ed. 896; and Deere v. Southern P. R. Co., 123 F. (2d) 438.

The cases cited do not support appellant's contention in view of the evidence in this record. We have set out the evidence with reference to the location and depth of the ditch, the size and location of the platform, the location of the several tracks and the pot signal, the use of the ditch by respondent and others for the purpose for which respondent was using it when he was injured and the duty of respondent to use the ditch and to board the car at that time and place, as well as the evidence of appellant's knowledge of and acquiescence in such use. On this evidence we cannot say, as a matter of law, that respondent's action in attempting to board the car from the ditch was so obviously dangerous and foolhardy as to bar recovery on the theory that respondent's act was the sole proximate cause of his injury. Contributory negligence, if any, was of course no bar to recovery under the Act. The court did not err in refusing to direct a verdict for appellant. Bailey v. Cent. Vt. Ry. Co., supra; Lavender v. Kurn, 327 U. S. 645, 652; Ellis v. Union Pac. R. Co., 329 U. S. 649, 653.

■ [493] Appellant next contends that the court erred in *permitting* counsel for respondent "to argue to the jury that plaintiff

was entitled to recover for all of his future earning rather than their present value." The record does not support the assignment. The court sustained appellant's objection to the argument referred to and admonished the jury to "follow the instructions of the court on the measure of damages." Appellant subsequently objected to similar argument by respondent's counsel and asked "that counsel be reprimanded for making that kind of an unfair argument in the face of the law." Counsel modified his argument, the court made no ruling and there was no further objection. On the record presented, no error or abuse of the court's discretion is shown. Cordray v. City of Brookfield, (Mo. Sup.), 88 S. W. (2d) 161, 165; Kelley v. Ill. Cent. R. Co., 352 Mo. 301, 177 S. W. (2d) 435.

Was the verdict grossly excessive, as claimed? Respondent was fifty-one years of age and his life expectancy was twenty years. He had worked for the Terminal prior to 1932 and since 1944. He was in good health, earning $300 per month. He was in the hospital from April 25 to May 7, 1946, and has been receiving treatment since. On account of the injuries received, he has not been able to do any work or earn anything. The big toe on his right foot had to be completely amputated to its base. The amputated stump is covered with a very thin scar and the nerves that went into the toe are impinged in the scar. "The metatarsal bone . . . which is the main weight-bearing bone at that point," is very close to the surface and the scar adheres to the underlying bone. There is no padding whatever on the innermost side of the amputated area and very little "on the second toe side of the foot." The area about the amputation is discolored, blackened and very sensitive to pressure. Remedial surgery to remove scar tissue and provide pad by skin grafting would have a reasonable chance of success, although a second attempt might be required and this would require time. Remedial surgery, if successful, would relieve respondent of considerable acute pain and sensitiveness, but he would not be able to walk any great distance, nor do labor that required him to be upon his feet any length of time. There is also a possibility that nerves might be caught in new scar tissue, cause pain and require additional surgery.

Respondent's second toe was crushed and 2½ joints are now missing. There is a small stub of this toe, approximately a quarter of an inch long, which is retracted upward in a fixed position. Respondent is unable to bring it down or make it stay down. His foot would function better if this toe were amputated. Amputation would entail a minor surgical risk. The third toe was injured and, in the middle joint, has an ununited fracture which shows no signs of healing.

Respondent suffers pain, can't sleep on his right side and does most of his sleeping while sitting in a chair. There is some atrophy of the right leg and of the bone structure of the entire right foot. "This

is due to a decrease in the bone density, absorption of lime salts that may be caused by lack of use or irritation or both.'' Respondent has trouble in going down steps and he has fallen five different times. He goes downstairs sideways, on his left foot, to protect the right. He walks with a cane and limps, favoring the injured foot. The condition of his foot and leg is permanent, unless changed by corrective measures, and even then there will be permanent disability, but less than at present.

Appellant contends that respondent is able to resume work as a switchman. Appellant offered evidence that two employees who received similar injuries, were able to return to work. We see little value in this evidence, since these persons recovered and are able to work, while respondent has not recovered and is disabled. Appellant cites Turner v. Central Hardware Co., 353 Mo. 1182, 186 S. W. (2d) 603, 610, where a $15,000 verdict for a leg injury was reduced to $10,000. No case closely similar on the facts is cited. Respondent emphasizes his disability and prospective loss of earnings.

No accurate scale for measuring the money value of the damages sustained is [494] available. Each case must be considered upon its own peculiar facts, giving some consideration to economic conditions and the compensation awarded and permitted in cases of somewhat similar injuries. Joice v. M.-K.-T. R. Co., 354 Mo. 439, 189 S. W. (2d) 568, 577. There was a time when this court considered $10,000 to be ample and reasonable for the entire loss or amputation of a leg, but there is no doubt that times have changed, as suggested by respondent, and the value of money has materially decreased. Willis v. Atchison, T. & S. F. Ry. Co., 352 Mo. 490, 178 S. W. (2d) 341, 343; Petty v. K. C. P. S. Co., 354 Mo. 823, 191 S. W. (2d) 653, 659.

Considering the evidence favorable to respondent, the verdict is grossly excessive. The trial court ordered a remittitur, but we think the amount remaining is still grossly excessive. If plaintiff will remit $10,000 additional within ten days, the judgment will stand affirmed for $15,000. Otherwise the judgment will stand reversed and the cause will be remanded for a new trial.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the Court en Banc. *Tipton, Ellison* and *Hyde, JJ.,* concur; *Douglas, J.,* concurs in result; *Conkling* and *Clark, JJ.,* dissent; *Leedy, C. J.,* not sitting.