261 S.W.2d 95 (1953)
JOHNSON
v.
LEE WAY MOTOR FREIGHT, Inc., et al.
No. 43384.
Supreme Court of Missouri, Division No. 1.
September 14, 1953.
Rehearing Denied and Opinion Modified October 12, 1953.
*96 Frank C. Mann, Glenn A. Burkart, Mann, Mann, Walter & Powell, Springfield, for appellants.
Smith and Williams, Springfield, for respondent.
COIL, Commissioner.
A jury returned a verdict for $20,675 for personal injuries and property damage sustained by plaintiff as a result of the alleged negligence of defendants-appellants. Plaintiff, pursuant to the trial court's conditional order, remitted $7,500 and defendants have appealed from the ensuing judgment for $13,175. They contend that the trial court erred: In failing to direct a verdict for defendants on the ground that plaintiff was guilty of contributory negligence as a matter of law; in the exclusion of evidence; and in the giving of instructions. They also contend that $12,500, the portion of the judgment for personal injuries, is grossly excessive.
Plaintiff's contributory negligence was a jury question unless it may be said from all the evidence and the favorable inferences therefrom, viewed in the light most favorable to plaintiff, that the only reasonable conclusion is that plaintiff was negligent. Thompson v. Byers Transportation Co., 362 Mo. 42, 239 S.W.2d 498, 499 [1-4].
The evidence so viewed was such that the jury could reasonably find: That plaintiff, on active duty in the U.S.A.F., was returning from his home in New York to his station at Lubbock, Texas, in his Frazier automobile (he had driven Highway 66 only once before, viz., on his trip from Lubbock to New York), when about 1:30 a. m., on June 17, 1951, he collided with the rear end of a stationary tractor-trailer (referred to hereinafter as truck) facing west in the middle of the north half of Highway 66 at a place about 4 to 7 miles west of Rolla; that the truck was owned by defendant Lee Way Motor Freight, Inc., and was operated by its employee, defendant Sterrett; that, ever since leaving New York State, plaintiff and *97 a soldier friend had been alternating in driving and sleeping; that plaintiff began driving last before the collision at a place west of St. Louis and at a time when heavy fog over the highway restricted visibility to such an extent that it was necessary for him to proceed very slowly; that as plaintiff approached Rolla, the heavy fog lifted and from there to the place of the accident patches of fog from time to time drifted across the highway making it damp and limiting visibility during the time that he was in a particular fog patch, but that between such patches there was no limitation of visibility; that as plaintiff approached the last fog patch before the collision, he was driving 50 to 55 miles per hour with his headlights on bright; that he observed ahead a fog patch which was not "too big," probably 3 to 5 car lengths in depth; that as or just after he entered this patch, he dimmed his headlights and took his foot from the accelerator; that his visibility in the patch was approximately 30 to 35 feet; that just as he emerged from the patch at a speed of about 40 miles per hour, he saw headlights shining towards him, the back end of a truck about 30 to 35 feet ahead (on which he saw no lights) and persons standing in the south half of the pavement opposite the truck; that he started to pull to his left to go around the truck but either then saw or realized that by so doing he would run into the persons standing there and swerved back into the north half of the highway and jammed on the brakes too late to have any stopping effect and ran into the rear end of the truck.
The highway was a 20 foot wide "blacktop," comparatively straight for considerable distances each way from the collision point, with dips in the surface (inconsequential insofar as the accident was concerned), with no dividing center line painted on its surface, and with 8 foot shoulders in good condition.
Prior to the time of the collision, a Ford traveling west about 250 feet ahead of defendants' truck was sideswiped by an eastbound Dodge. The Ford was stopped on the north shoulder facing west. The Dodge was stopped on the south shoulder facing east with either its headlights or parking lights burning. Following the Dodge was a Packard which also stopped on the south shoulder (with its headlights or parking lights burning) facing east, about 250 feet west of the Dodge. Within seconds after the sideswipe, defendants' truck came to a stop in the middle of the north half of the traveled portion of the highway. The driver and an occupant of the Dodge were the wives of the driver and an occupant of the Packard. These people left their respective automobiles as did the driver of the Ford and were engaged in conversation in which it appears the truck driver, defendant Sterrett, took some part. In any event, 4 to 5 minutes had elapsed (during which the truck remained stationary, Sterrett remained in his seat, the Dodge and the Packard remained on the south shoulder facing east with headlights or parking lights on, and some of the occupants of the automobiles stood in the south half of the highway opposite the truck), when plaintiff's automobile ran into the rear of the truck.
There is no contention that plaintiff failed to make a submissible case. Defendants' contention that plaintiff was guilty of contributory negligence as a matter of law is based upon the asserted proposition that it is always negligence as a matter of law to drive at such a speed that it is impossible to stop within the range of visibility. Plaintiff testified that at 50 miles an hour he could stop his automobile in less than 100 feet and that the damp pavement would probably cause the car to "slide a little more." Defendants say, therefore, that plaintiff's own testimony shows that he was traveling at a speed at which he could not stop within 30-35 feet, his range of vision while in the fog patch, and was thus guilty of contributory negligence as a matter of law.
Defendants concede that it is probable that the rule for which they contend has not been followed in some Missouri cases, but, as we understand, they say the rule is a proper one and that if it is no longer the law in this state, "the question *98 should be re-examined." The rule referred to by defendants has sometimes been called "the assured clear distance rule" and has been applied in certain Missouri cases, including Solomon v. Duncan, 194 Mo.App. 517, 185 S.W. 1141. Subsequent cases, however, including the comparatively recent case of Thompson v. Byers Transportation Co., supra, have rejected the rule insofar as it fixes an inflexible standard by which to measure negligence. That is to say, insofar as the rule means that a motorist is in all events and under all circumstances guilty of contributory negligence as a matter of law solely because he drives at a speed which is such that he cannot stop within the distance that his headlights make visible objects ahead of him. We continue to adhere to the view that one is not necessarily contributorily negligent as a matter of law solely because he drives at a speed which prevents his stopping within the distance his headlights reveal objects ahead of him; and that whether he is contributorily negligent as a matter of law depends upon all the circumstances in a particular case. See Prosser on Torts, Sec. 41, pp. 286, 287; 18 M.L.R. pp. 79, 80; Thompson v. Byers Transportation Co., supra; Kendrick v. Kansas City, Mo.Sup., 237 S.W. 1011, 1013 [3]; Drakesmith v. Ryan, Mo.App., 57 S.W.2d 727.
We are of the opinion that it was for the jury to decide in this case whether plaintiff was contributorily negligent in failing to so reduce his speed either before entering or upon entering the fog patch to have assured himself that he could stop his automobile within his range of vision. In this connection, we point out that the jury could consider that from northeast of Rolla to the point of collision visibility was good except for occasional fog patches; that the patch involved was not large or long; that plaintiff unexpectedly encountered a standing truck in the traveled portion of the highway where one would not assume its presence; that the truck was close to the end of the fog patch; that plaintiff unexpectedly encountered people standing to the left of the truck, preventing him from going around and thus avoiding a collision by means other than stopping; that plaintiff had no warning of impending danger; and that plaintiff could assume that he would not likely encounter the combination of circumstances which faced him as he emerged from the fog patch. We think there was an issue of fact presented as to plaintiff's contributory negligence which was for the jury to determine. We may not say that the only reasonable conclusion from the evidence is that plaintiff was negligent.
Defendants offered to prove by two witnesses that, after the truck had reached Oklahoma City and on the morning following the accident, an examination of the electrical system which operated the lights on the rear of the truck showed the connections, the switches, and the light bulbs in good operating condition (with the exception of one rear "stop light" which was damaged in the collision), and that no repair or other change in condition had occurred between the time of the accident and the time of the examination. Defendants contend that it was reversible error for the court to refuse the offer.
The evidence showed that the truck was driven by defendant Sterrett to Joplin, from there to Oklahoma City by another driver, and arrived there Sunday night (the day of the accident); that it was examined the next morning by a representative of defendant company and an employee of the manufacturer of the trailer.
The issue in the case as to the lights on the rear of the truck was not whether the connections, switches and bulbs were working properly, or even whether the lights were burning at the time of the accident. The issue was whether the rear truck lights were so covered with "road dirt" as to impair their visibility to such an extent that they could not be readily observed by plaintiff. All of plaintiff's witnesses, other than plaintiff himself, who testified on the subject said that lights were burning on the rear of the trailer. All of defendants' witnesses (including defendant Sterrett) who testified on the subject, said that the truck lights were burning at the time of the collision. True, plaintiff *99 said, "I know I didn't see any lights on the truck, and there wasn't any flares that I could see on the road, or any kind of lights." Plaintiff did not contend, however, that the lights were in any way defective insofar as electrical connections, switches or bulbs were concerned. It may be conceded that the proffered testimony of these two witnesses may have been some slight evidence, however remote, that the lights were in fact burning at the time of the collision. Such evidence, however, under the facts of this record, would have been of so little, if any, probative value (either upon the issue of whether the lights were burning at the time of the collision or whether they were so covered with road dirt as to make them not readily visible), in view of the direct testimony on those subjects, as to make the action of the trial court in excluding this testimony a proper exercise of discretion. And, in any event, we are convinced that the rejection of this testimony did not materially affect the merits of this action and thus we would not be justified in reversing and remanding this case for the alleged error in refusing defendants' offer of proof. Section 512.160, subd. 2 RSMo 1949, V.A.M.S.
Defendants contend that the trial court erred in giving instructions 2 and 4. An alleged error common to both instructions is that each assumed, without requiring the jury to find, that Rule 54 of the Missouri Public Service Commission was "in fact in existence." There is no merit in this contention. Plaintiff's petition alleged that defendants negligently stopped their tractortrailer on the traveled portion of the highway when it was practicable to stop or move it off the traveled portion, in violation of amended Rule 54 of the Public Service Commission of Missouri; and that such stopping was at a time when lights were required by Rule 55 and thus that defendants further violated amended Rule 54 in that they failed to place immediately on the roadway at the traffic side of said tractor-trailer a lighted fusee, a lighted red electric lantern or a red emergency reflector. Plaintiff offered in evidence Rules 54 and 55, properly certified by the secretary of the Commission. No objection was made to Rule 54. The only objection to Rule 55 was that it was not applicable under the facts in evidence. No objection was made which related to the nonexistence or invalidity of either rule. There was no real dispute as to the existence of Rules 54 and 55. Under the circumstances, it was not error for the instructions to assume that Rules 54 and 55 were valid and in force and effect. Burns v. Polar Wave Ice & Fuel Co., Mo.App., 187 S.W. 145, 147 [5, 6]. Defendants' argument that, because courts do not take judicial notice of the rules and regulations of the Commission a finding of their existence is an essential fact to plaintiff's recovery, is fallacious. No question of judicial notice is here involved. The rules were offered in evidence; thus no problem involving judicial notice was present.
Defendants contend that instruction 2 was erroneous in two other respects. A portion of Rule 54 provides in substance that when a motor vehicle is stopped on a traveled portion of the highway for any cause other than disability or necessary traffic stops at a time when lights are required by Rule 55 (during the period from one-half hour after sunset to one-half hour before sunrise) "a lighted fusee or lighted red electric lantern or red emergency reflector shall immediately be placed on the roadway at the traffic side of the motor vehicle."
Instruction 2 hypothesized defendants' failure to comply with the above-quoted rule as to placing a fusee or lantern or reflector and required further findings that defendant driver had the means and time to comply, that in so failing defendant failed to exercise ordinary care and was negligent, and that such negligence was the proximate cause of the collision. Defendants say that the jury could not reasonably find that the failure to place at the traffic side of the truck a lighted fusee, a lighted red electric lantern or an emergency reflector was the proximate cause of the collision. Defendants' argument is that there was no evidence that a fusee, electric lantern *100 or emergency reflector could have been seen at a greater distance than the lights or reflectors on the rear of the truck or the headlights of the automobiles parked on the south shoulder and facing plaintiff as he traveled westwardly. This argument overlooks the testimony that a red fusee burns with a "brilliant light" and overlooks the fact that defendants' compliance with the Commission's rules would have been by means of a fusee. Defendant Sterrett testified that he had fusees in the truck and was in the process of removing them from their holder (presumably to comply with the Commission's rules) when the collision occurred. (His testimony, disregarded in stating the evidence favorably from plaintiff's standpoint, was that the plaintiff ran into the truck almost immediately after the truck stopped.) Thus, while the instruction does hypothesize the failure to place a fusee or red electric lantern or reflector, nevertheless, under the evidence in this particular case, the jury was concerned with the truck driver's failure to place a fusee rather than a lantern or a reflector. And while it is true that there was no direct evidence as to how far a fusee could be discerned burning at the side of a truck under the conditions which existed at the time, nevertheless it was for the jury to say whether the "brilliant light" of the fusee could have been seen in time to have warned plaintiff of impending danger and to have permitted him to have avoided the collision either by stopping or by driving onto the sufficiently wide north shoulder.
And even if it may be said that under the instruction the jury had to find that the failure to place a red lantern or emergency reflector was a proximate cause, still it was for the jury to decide whether either of these signals could have been discerned or would have indicated danger sooner and enough sooner than the opposing head-lights of automobiles or the mud-dimmed lights on the rear of the truck. It would seem that the warning methods provided in the Commission's rules are superior to and more effective than the warning provided by the usual lights and reflectors on the rear of a truck or by the headlights of opposing automobiles, else there would be little reason for the rules. In any event, it was for the jury to say whether if either of the warning methods prescribed had been used, the collision could have been avoided and whether the failure to so warn was a proximate cause.
Defendants say that instruction 2 was further erroneous in that it told the jury "to find the appellant Sterrett guilty of negligence if, after the truck stopped, he failed to place immediately on the roadway, at the traffic side of his stopped tractor-trailer" one of the warnings provided. Defendants contend that the word "immediately," unexplained, exacts of defendant truck driver a greater degree of care than that imposed by law. This contention overlooks, however, that instruction 2 qualified "immediately" in that it required the jury to find that defendant Sterrett had the means and the time to place the warning prior to the collision and that his failure to so do was a failure to exercise ordinary care and constituted negligence. We think that the reasonable construction of the rules was properly set forth in the instruction and that the jury would understand that "immediately" meant, with reasonable and proper diligence and not without interval of time. If there was any doubt as to the meaning of "immediately," it was removed by defendants' instruction B which told the jury, "you cannot find the defendants guilty of negligence for the failure to place a lighted fusee, lighted red lantern or red emergency reflector on the roadway at the traffic side of the tractor-trailer unless the plaintiff has proven to you by the greater weight of the credible evidence that after the truck and trailer stopped and before plaintiff's automobile collided with the trailer the defendant Sterrett had time, in the exercise of ordinary care to have so placed such warning signal, and that by so doing, if you so find, the collision would have been averted."
Plaintiff, 23 at trial time, had finished high school in 1947 and thereafter until December, 1950, when he enlisted in *101 military service and was assigned duty as a member of an aircraft maintenance crew, had been engaged in cutting logs, acting as a hunter's guide, driving a taxi, playing semiprofessional baseball and basketball, firing a boiler and doing heavy construction work in Alaska. His average wages were $200 to $600 per month. He was in good physical shape prior to the accident.
Plaintiff said that he sustained cuts on his neck, face, arms and hands; his nose was hurt and his right hip was dislocated. He was taken to a Rolla hospital and later was removed to the Fort Leonard Wood hospital. He was in traction for 6 weeks, operated on for removal of a bone chip, again in traction for 6 or 7 weeks, remained in bed for 3 more weeks, in a wheel chair for 7 to 10 days, and wore a walking caliper between late September, 1951, and the latter part of January, 1952. His hip bothered him the entire time, evidenced by sharp pains. The walking caliper was most uncomfortable.
He returned to duty in the Air Force at Lubbock on November 12, 1951, and was assigned to "light duty," clerical work in the orderly room, where he worked with discomfort because required to sit for lengthy periods. He has hip pains, particularly during changes of weather. He has tried unsuccessfully to run and engage in athletics. He has a scar on his left forearm. Plaintiff's complaint at the time of trial was that his right hip and leg from the knee up gave him "trouble."
First Lieutenant Ellman, chief of orthopedic surgery at Fort Leonard Wood, first saw plaintiff in the post hospital on June 19, 1951, where plaintiff was in traction, a 10 pounds sustained pull on his right leg. Dr. Ellman said: "I acquainted myself thoroughly with his case; * * * he had a history of having dislocated his right hip, * * * reduced * * * by the surgical officer of the day, * * * and he (plaintiff) had a tender, painful hip as well as some lacerations on his arm, * * *. I think his finger had a cut on it. (Plaintiff) was kept in bed in traction for a period of about five weeks * * * (then) his hip was operated on (3½ hour arthrotomy) to remove a fragment of bone that had been chipped off at the time of his injury, and was lying in the hip in such a way that it would interfere with * * * walking, he was then placed back in traction for a period of about six more weeks, at the end of that time he was fitted with a brace known as a walking caliper that would enable him to be ambulatory without bearing any weight directly on the hip joint * * *." Dr. Ellman last saw plaintiff in October, 1951, when in response to an Air Force request plaintiff was discharged from the Fort Leonard Wood Hospital and advised to seek medical evaluation at his next station. Plaintiff was then still using his walking caliper and needed continued medical supervision.
In Dr. Ellman's opinion, "when the hip bone has been dislocated, in later years a disability develops in most cases that would be in the nature of discomfort and possibly some degree of limitation of motion, * * * the disability develops over a period of years."
Dr. D. L. Yancey, an orthopedic surgeon, examined plaintiff on January 7 and June 2, 1952. At the first examination plaintiff complained of pain in his right hip which was worse when he walked or after sitting for long periods. Plaintiff wore a right leg brace and walked with a definite limp. Most of his disability was limited to his right hip and leg, although he had noticeable superficial scars on his left forearm. Dr. Yancey said: "He had considerable weakness in his thigh muscle, and associated with some tenderness when firm pressure was made. At that time, he had some limitation of motion in the hip joint. X rays * * * revealed a small defect in the head of his right thigh bone, which evidently had been caused by a fragment that had been removed. He had an operative scar in the region of his right hip * * * his right thigh was * * * eighteen inches in circumference * * * the left thigh * * * eighteen and three-quarters *102 inches." There was "a moderate degree of numbness along the lateral aspect of the right thigh, below the scar."
At the second examination plaintiff's brace had been discontinued and he walked satisfactorily with no appreciable limp. He still had a moderate degree of weakness in his thigh muscle. His right thigh measured 17¼ inches, his left 18½ inches. "And his degree of permanent disability appears to be limited to his right hip and right thigh region. I think he will have some permanent disability around his right hip, which will be due to the defect in the ball of the femur, * * * and I think he will have some permanent muscle weakness." The "function of his right hip will be limited to approximately one-fifth of what the normal hip would be." He had a normal range of motion in the hip but experienced pain when the hip was rotated internally. Plaintiff should get along satisfactorily in normal activities but will have difficulty in carrying out athletic activities; he could do some climbing but any activity which throws strain on the hip joint, such as lifting or climbing, will cause considerable discomfort.
Plaintiff made no proof of medical or hospital expenses or loss of earnings.
As noted, the trial court required a remittitur of $7,500 from the $20,000 jury verdict for personal injuries. Defendants say the reduced amount is yet excessive. They cite Taylor v. Lumaghi Coal Co., 352 Mo. 1212, 181 S.W.2d 536; Turner v. Central Hardware Co., 353 Mo. 1182, 186 S.W. 2d 603, 610, 158 A.L.R. 1402; Hill v. Terminal R. Ass'n of St. Louis, 358 Mo. 597, 216 S.W.2d 487. In the Taylor case (1942), a judgment for $15,000 was reduced to $10,000 for a 55 year old railroad employee earning $200 per month who had sustained a tearing loose of both semilunar cartilages from the lower bone of the knee joint, resulting in permanent inability to do heavy manual labor. In the Turner case (1945), a judgment for $15,000 was reduced to $10,000 for a 57 year old plant guard earning $50 per week who had loss of earnings and medical expenses totaling $1,850 and who sustained a "badly comminuted fracture through the left tibia that extended into the knee joint and both sides of the knee were depressed pretty much", [353 Mo. 1182, 186 S.W.2d 610] with 50 percent permanent disability of the knee, likelihood of future trouble, and one-inch shortening of the left leg. In the Hill case (1948), a judgment reduced by the trial court to $25,000 was here further reduced to $15,000 for a 51 year old railroad employee earning $300 per month, who sustained injuries resulting in the amputation of the right big toe, 2½ joints of the second toe and a fracture of the third toe, causing inability to perform labor requiring him to remain on his feet for any length of time, and atrophy of the right leg and foot.
Considering instant plaintiff's age, and taking into consideration the amounts finally awarded in the cited cases (and other cases, including Hill v. St. Louis Public Service Co., 359 Mo. 220, 221 S.W.2d 130, 135, 136), the dates of decisions in all of those cases, and giving particular weight to the fact that the trial court carefully considered the question of excessiveness as indicated by its $7,500 remittitur order, while the judgment is undoubtedly a large one, we are unable to say that the record demonstrates that the amount of plaintiff's damages, as reduced by the trial court, is still excessive.
The judgment is affirmed.
VAN OSDOL and LOZIER, CC., concurs.
PER CURIAM.
The foregoing opinion by COIL, C., is adopted as the opinion of the court.
All concur.