PEARL LENA POTTERFIELD, Administratrix of Estate of EARL WADE POTTERFIELD, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, Appellant.—5 S. W. (2d) 447.

Division Two, March 24, 1928.

J. L. *Howell* and *R. E. Blodgett* for appellant.

*Charles P. Noell* for respondent; *Glen Mohler* of counsel.

HENWOOD, C.—This is a suit for damages under the Federal Employers' Liability Act, filed in the Circuit Court of the City of St. Louis, by the respondent (plaintiff below), as administratrix of the estate of Earl Wade Potterfield, for the benefit of herself, as the widow, and two minor children of deceased, based on the alleged negligence of appellant (defendant below) as the cause of his death, while employed by appellant as a railroad switchman and while engaged in interstate commerce. At the close of the plaintiff's evidence in chief, the trial court directed a verdict as to the St. Louis Mer-

chants Bridge Terminal Railroad Association, it being originally joined as a defendant. The trial resulted in a verdict and judgment for the plaintiff in the sum of $22,750 against the Terminal Railroad Association of St. Louis, and the case is here on its appeal from that judgment.

Proof made by the plaintiff shows that, at the time in question, defendant (Terminal Railroad Association of St. Louis) owned and operated certain railroad engines, cars, tracks and switch yards in the city of St. Louis, Missouri, and was engaged as a common carrier of freight and passengers at said city and between said city and the city of East St. Louis, Illinois. One of defendant's switch yards, in St. Louis, was known as the Eleventh Street Yard. It was connected with the switch yard of Cupples Manufacturing Company known as Cupples Station and located between Seventh and Ninth Streets. The tracks at Cupples Station were used for the accommodation of various business and commercial enterprises of St. Louis, in loading and unloading shipments of freight. Early every morning, usually between six and seven o'clock, defendant brought a train of cars from East St. Louis, Illinois, to its Eleventh Street Yard in St. Louis, for immediate delivery to Cupples Station. This train of cars was known as the Cupples drag, and consisted of cars received from various railroad companies which terminated their westbound freight hauls at East St. Louis. Potterfield (deceased) was employed by defendant as a switchman, and was run over and killed while he and the other members of his switching crew were engaged in moving one of these trains of cars (the Cupples drag) from defendant's Eleventh Street Yard to Cupples Station, about 6:38, on the morning of February 9, 1922. This switching crew was called the Tenth Street crew or the Cupples crew and included Hartman, foreman, Potterfield, Gilbert and Maddox, helpers, Mason, engineer, and Pierson, fireman. The switch engine (headed east) was coupled to the west end of the Cupples drag of twenty-one cars and was shoving this train of cars eastward on "14 lead" toward "Cupples crossover" to "track 15," the next track on the south. The clearance was narrow between "Cupples crossover" and "72 main line," the next track on the north. Gilbert had been lining up the switches for Cupples Station and was standing about 300 feet east of the east end of the Cupples drag. Potterfield, by a stop signal, had stopped the Cupples drag at the west end of "Cupples crossover" to allow a C. B. & Q. westbound passenger train to pass on "72 main line." While the passenger train was passing, Potterfield was standing "straddle of the north rail" at the east end of the Cupples drag, facing north and looking at the passenger train as it passed. Hartman, the foreman, was standing on the north side of the Cupples drag and about two car-lengths west of Potterfield.

Before the last coach of the passenger train had passed Potterfield, Hartman gave a back-up signal, causing the Cupples drag to be moved suddenly and causing Potterfield to be knocked down by the end car and to be run over by the wheels on the east end and north side of said car, before the train was stopped. At this time, Maddox was standing on the north side of the Cupples drag, about one or two car-lengths from the engine, and engaged in passing signals to the engineer. Weber, one of defendant's switch tenders, who was standing one car-length west of Potterfield on the north side of the Cupples drag, testified as follows:

"On this particular morning they were shoving through they coupled the engine on and as they coupled the engine on they generally let the cars roll for a couple car-lengths to see if they are all together, and the man at the end of the train stops the train to see that they are all together and gives the back-up signal for them to proceed eastward. He did this and he started shoving east; he was riding the east car and he got right about this point of this switch right here (indicating on photograph, plaintiff's Ex. B) and give a stop sign to stop the train on account of the passenger train coming up this main line here (indicating), and he stepped around the end of the car to wait until this train, passenger train, had passed, and I was leaning against the car there and I could just see him step around the end of the car, and after he stepped around the only thing I could view was his feet, and foreman Hartman was just a couple car-lengths west of him, and before this train, this passenger train, had passed foreman Hartman gave a back-up signal to the engineer, and started backing this train up, and I started to the north side of the shanty to watch this passenger train pass and I seen Hartman give what they call the wash-out sign or vicious stop sign, and then he started running toward the east end of the train. I looked down there and I could see Mr. Potterfield being rolled and cut up by this train."

Gilbert, one of the switching crew, above mentioned, testified along the same line, as follows:

"After shoving out of Eleventh Street about two or three car-lengths they give a stop sign, and the rear end of the train, that is, the east end of the train shoving east stopped just about the west end of this crossover switch here (indicating on photograph, plaintiff's Ex. B). About that time there was a C. B. & Q. passenger train approaching, coming west out of the hole here on this 72 track (indicating), I believe it is leading to the Union Station, and after the foreman, Hartman, give this stop sign, that is, he gave the stop sign after he seen the train approaching, Mr. Potterfield stepped around the end of this car here (indicating), east end of the car, and I might state that I was on down here at Cupples Station (indicat-

ing), and Mr. Potterfield walked around the east end of this car and in order to be out of the way of this C. B. & Q. train. About the time they were almost passed, Mr. Hartman gave a back-up sign, immediately followed by a stop sign, that is, a wash-out, and I seen— I was standing down here (indicating)—I seen the car come against Mr. Potterfield. It wasn't quite daylight, it wasn't altogether daylight, we were still using our lanterns, but it wasn't necessary. The car struck Mr. Potterfield right about here (indicating) and drug him down just about to the east end of the crossover switch there (indicating)."

Weber testified that Potterfield did not give the back-up signal. Gilbert testified that neither he nor Potterfield gave the back-up signal. And Gilbert testified that, at the time Hartman gave the back-up signal, he (Gilbert) was facing west, from his position at Cupples Station, and could see Potterfield, Hartman and Weber, and the engine, and Maddox's lantern. Both Weber and Gilbert testified that, in moving the Cupples drag from the Eleventh Street Yard into Cupples Station, it was the established and invariable rule, custom and practice, among defendant's switching crews, for the long-field man (man in Gilbert's position) to give the back-up signal to the short-field man (man in Potterfield's position), and for the short-field man to relay the signal to the engineer, through the men between him and the engine, the foreman (Hartman in this instance), and the pin-puller (man in Maddox's position). And both Weber and Gilbert further testified that, while a certain clearance signal from the electric semaphore was necessary for this movement of the Cupples drag, the rule, custom and practice also required a signal from the switching crew before any movement of the train was made.

On cross-examination, Weber admitted he stated at the coroner's inquest that, as the passenger train passed, Potterfield was riding on the side of the car and he saw the car drag him along, but he didn't know what hit Potterfield or what caused the accident. He also admitted that he signed and made oath to a statement prepared by defendant's claim agent, to the same effect as his testimony at the coroner's inquest. Both of these statements were offered in evidence in connection with Weber's cross-examination. (Defendant's Exhibits 1 and 2.)

The cross-examination of Gilbert developed that he did not testify at the coroner's inquest, but he admitted that he signed and made oath to a statement prepared by defendant's claim agent, in which he stated that he did not witness the accident and had no personal knowledge of what occurred, and that he observed the wash-out signals, but thought some of the cars were off of the track. This statement was offered in evidence in connection with his cross-exami-

626

nation. (Defendant's Exhibit 5.) Neither Weber nor Gilbert were in the employ of defendant at the time of the trial.

Weber testified that defendant brought this train of 21 cars (the Cupples drag) from East St. Louis, Illinois, across the river bridge and through the tunnel, to its Eleventh Street Yard in St. Louis, Missouri. Beinther, employed by the Cupples Company as foreman of the freight department, testified that he made up his record list of this train from the cards on the cars, while the same were standing in defendant's Eleventh Street Yard. Referring to this list, in connection with his testimony, he gave the numbers, initials, contents and consignees of sixteen of these cars, which contained various kinds of merchandise, including coffee, sugar, meal, woodenware, beams and crossarms, consigned to various business companies and individuals at St. Louis, Missouri. Referring to the initials of these sixteen cars, he further testified that the cars were owned by railroad companies which had their western *termini* at East St. Louis, Illinois. The testimony of Beinther was corroborated and supplemented by Seamon, chief clerk at Cupples Station. Testifying from records kept in the usual course of his company's business, he said the car of meal came from Richland Center, Wisconsin, the car of coffee from New Orleans, Louisiana, and that he didn't have sufficient time to locate the other bills, but his records indicated that the other cars of merchandise came from the ''East.'' He further said that his records were made from the bills for the cars; that the bills were made by the various railroad companies which handled the cars to East St. Louis, Illinois; and that his company (the Cupples Company) received the bills from East St. Louis, through the mail exchange.

The plaintiff testified that she and her deceased husband were married in 1905 and lived together continuously until the time of his death; that there were two children, named Elmer and Ruth, born of their marriage, pointing out the children in the court room; that her husband would have been 42 years of age on March 3rd following his death; that his average monthly earnings in wages were $180, of which sum $30 was spent for his own support and the balance of $150 was spent for the support of herself and their two children and for general household expenses. Her appointment as administratrix was admitted by defendant.

For the defendant, Hartman, the foreman, Mason, the engineer, Pierson, the fireman, Maddox, the pin-puller, Henry, the yardmaster, and Werre, an extra switchman, testified that, after the electric semaphore signal showed the proper clearance sign for the movement of the Cupples drag into Cupples Station, it was the custom and practice for the foreman to originate the signals for the switching crew. However, some of the testimony of Henry, the yardmaster,

should be noted in connection with plaintiff's case. When being questioned by defendant's counsel, on direct examination, concerning the origin of signals, he said: "*Well, that depends on the conditions. If the cars are ready to shove, the man at the rear end of the train would give the signal,* or the foreman can give the signal if he is ready. *If he knows the men are all in their proper position,* then they shove in there." (Italics ours.)

Concerning the accident, Hartman, the foreman, testified that Potterfield was riding on the ladder of the end car of the train and, when the train had been shoved about four car-lengths, he saw Potterfield fall and he (Hartman) gave the wash-out stop signal; that the C. B. & Q. passenger train was passing at the time; and that he did not know what caused the accident. On his cross-examination, he admitted that, sometime after the accident, he signed and made oath to a statement, in which he described the accident, as follows: "When my train came to a stop on the stop signal that I had just given he must have gotten down off of the east car and gotten around at the east end of the train, so as not to get hit by this passenger train, for just as I gave the back-up signal I noticed Potterfield standing just at the east end of the train and about on what would be the north rail of the track on what our train was standing on like he had gotten there to get out of the way of the passenger train. I had no more than give the back-up signal when I noticed him there where the train would hit him when I gave the stop sign, but the engineer had already moved the train on my back-up signal and *got him* before I could stop the train. I also hollered at Potterfield, but it was *too late,* for the engineer had moved *the instant I gave the back-up signal and Potterfield was right close to the east end of our train.* . . . Well, at the point where we were standing the tracks are very close together and when two trains are passing and especially when they are going in opposite directions it is very dangerous to be in there between the two trains, and *the tracks were even a little closer together where he was than where I was; that evidently accounts for him standing there.*" (Italics ours.) It further appears, from the interrogation of this witness by both sides, that he made this statement, after he left the service of defendant, at the solicitation of Mr. Charles Noel, of counsel for plaintiff, and he (Hartman) testified that he made the statement on the promise of financial reward from Mr. Noel. When pressed by defendant's counsel, on redirect examination, as to this promise, he testified: "He (referring to Mr. Noel) said he would take care of me was all the remark that was made." On cross-examination, he further admitted that he wrote and mailed a certain letter to Mr. Noel, in which he asked for a loan of $100, and in which he referred to the fact that his two or three previous letters to the same effect had brought no re-

sponse. This letter was dated "Atlanta, Ga., Sept. 18, 1923." At the time of the trial of this case, Hartman was employed, so he testified, as yard conductor for the Terminal Railroad at Jacksonville, Florida.

In rebuttal, the plaintiff offered and read in evidence the sworn statement and letter of Hartman, above mentioned (plaintiff's Exhibits G and F).

I. Counsel for defendant make a direct challenge on the sufficiency of the proof that Potterfield was engaged in the business of interstate commerce at the time he was run over and killed. This contention cannot be seriously considered, in the face of the plain facts of this case. Weber, one of defendant's switch tenders, testified that defendant brought the train of cars in question (Cupples drag) from East St. Louis, Illinois, to its Eleventh Street Yard in St. Louis, Missouri, and that he signaled this train into the switch yard as it emerged from the tunnel on its trip across the river bridge and through the tunnel. That these cars were received by defendant at East St. Louis may be readily inferred from the testimony of Beinther, foreman of the freight department, and Seamon, chief clerk, at Cupples Station. There was positive evidence that 16 of the 21 cars in the train were carrying interstate shipments of freight. This appears from the cards on the cars and the bills of the connecting carriers, which handled the cars from various points, including Richland Center, Wisconsin, and New Orleans, Louisiana, to East St. Louis, Illinois. The records at Cupples Station, kept in the usual course of business, indicated that the other cars contained merchandise from the "East." At the very moment Potterfield was knocked down and killed by one of the cars of this train, he was engaged as defendant's switchman, in directing the movement of this train, or assisting in its movement, to its destination at Cupples Station, where delivery was to be made of said interstate shipments of freight. These cars, at least sixteen of the twenty-one, were being used in the business of interstate commerce, at the time, and both defendant and its switchman, Potterfield, were engaged in the immediate dispatch of that business. True, these cars and these shipments of freight were on the last lap of their long interstate journey; yet, it must be conceded that the last lap of the journey was as much a part of the journey as the first. [Pedersen v. Railroad, 229 U. S. 146; Kinzell v. Railroad, 250 U. S. 130.] In the case of Railroad v. Carr, 238 U. S. 260, cited and relied on by defendant, it was held that "each case must be decided in the light of the particular facts with a view of determining whether, at the time of the injury, *the employee is engaged in interstate business, or in an act which is so directly and immediately*

*connected with such business as substantially to form a part or a necessary incident thereof.''* (Italics ours.) It is apparent at once that the holding in that case is clearly against the contention of defendant's counsel and fully supports the conclusion reached in this case.

Counsel for defendant attack the credibility of some of plaintiff's witnesses and urge that the verdict should not be permitted to stand  because ''it is against the credible evidence,'' on the question of defendant's negligence. This was an appropriate argument for the jury, but it is of no avail here, on the record before us. This record does present an outstanding example of the over-zealous activities of a plaintiff's lawyer and of a railroad defendant's claim agents in attempting to shape the evidence to suit their respective theories of recovery and defense against recovery. This is a practice that both trial courts and appellate courts have universally condemned. It must be remembered, however, that it is equally abhorrent to the law, whether it appears on one side of the case or the other; and where, as in this instance, this practice has been employed by both sides, this court makes no choice between the offenders against a wholesale administration of the law. It is true that, immediately following the accident, both Weber and Gilbert signed and made oaths to statements, prepared by defendant's claim agents, which are contradictory to their testimony at the trial. It is also true that Weber, in company with one of defendant's claim agents, attended the coroner's inquest and there testified to facts which are in direct conflict with his testimony at the trial. But, it is likewise true that Hartman, foreman of the switching crew and the man charged with giving the fatal back-up signal, signed and made oath to a statement concerning the accident, which contradicts his testimony, for defendant, at the trial, and which corroborates, in every important detail, the testimony of Weber and Gilbert at the trial. While Hartman testified that, in making the contradictory statement to Mr. Noel, one of plaintiff's attorneys, he was influenced by the promise of financial reward, he further testified on this matter, as follows: ''He (referring to Mr. Noel) said he would take care of me was all the remark that was made.'' Whether he was ever rewarded by Mr. Noel does not appear, but it does appear, from Hartman's letter to Noel (plaintiff's Exhibit F), that Hartman made two or three written requests for a loan of $100 from Noel and was somewhat disappointed in not being so favored. The testimony of Weber and Gilbert at the trial, and the sworn statement of Hartman, made not long after the accident, furnish a reasonable explanation as to how Potterfield was killed. From the testimony and the statement mentioned, it clearly appears that Hartman vio-

lated the established rule, custom and practice, in giving a premature back-up signal, after Potterfield had stopped the Cupples drag to allow the C. B. & Q. passenger train to pass and before the last coach of the passenger train had passed Potterfield and the end of the Cupples drag, at which he (Potterfield) was stationed. Moreover, it is undisputed that the clearance between the two trains at this point was very narrow and that Potterfield's position at the time was not unusual nor unexpected. The place and position in which Potterfield's body was found, only the east wheels on the north side of the end car of the Cupples drag having run over him, and other physical facts and undisputed facts, strongly support the testimony of Weber and Gilbert at the trial and plaintiff's theory of the accident. The jury had the advantage of observing all of the witnesses for both sides and their conduct and demeanor while on the witness stand. The contradictory statements of Weber and Gilbert, on one side, and of Hartman on the other side, were read to the jury and considered by them, in connection with all of the other facts and circumstances in evidence. Obviously, they believed the testimony of plaintiff's witnesses. The trial judge, who, also, observed the conduct of the witnesses and noted all other incidents of the trial, approved the verdict. In any event, it is elementary that the jury weigh the evidence and pass upon the credibility of the witnesses; and where, as in this case, there is substantial evidence to support their findings, this court will not interfere. It follows that the demurrers to the evidence were properly overruled.

II. Plaintiff's Instruction 3 is assailed on two grounds. First, it is argued that this instruction does not require the jury to find sufficient facts to support a finding that Potterfield was engaged in interstate commerce at the time of the accident which resulted in his death. Among other things along this line, the instruction says:

"and if you further find and believe from the evidence that at *all times hereinafter mentioned* one or more of the cars in *the train of cars hereinafter mentioned contained at all said times* one or more shipments *originating* in one state of the United States and *destined* to and *en route* to another and different state of the United States," etc. (Italics ours.)

This instruction also required the jury to find that the defendant was a common carrier by railroad and that Potterfield was engaged, as a member of defendant's switching crew, in moving or in directing the movement of the train of cars mentioned, containing the interstate shipments mentioned, while the train of cars was on its interstate journey and while the interstate shipments were "en route" to their destination. It seems perfectly clear that, when the part

of the instruction above quoted is read and considered in connection with the other parts of the instruction just referred to, the facts recited in the instruction, taken as a whole, are amply sufficient to support the jury's finding on the question of interstate commerce. And, as indicated in the discussion of the evidence, the jury's finding in this particular was fully warranted. In view of defendant's contentions, both as to the sufficiency of proof and of this instruction, on this phase of the case, it should be noted that defendant, though in possession of records and other information relating to this train of cars, did not offer anything in contradiction of the proof tendered by plaintiff.

It is further argued that this instruction is erroneous because it predicated a verdict for plaintiff on the following findings: *"and if you find that defendant's foreman in charge of defendant's switching crew failed to exercise ordinary care, and if you find that by reason thereof Earl Wade Potterfield was injured and died as a result thereof,"* etc. (Italics ours.)

This part of the instruction, standing alone, would have broadened the issue of defendant's negligence under the pleadings and would have given the jury a roving commission, as counsel contend, but, when considered in connection with other parts of the instruction, it plainly appears that the part of the instruction complained of had no such effect. On this issue, other parts of the instruction, in substance, required the jury to find that there was an established custom and practice of giving signals for the movement of the train in question; and that, under such custom and practice, the train would have been held stationary, while Potterfield was at the rear end of the train, until he (Potterfield) or another member of the switching crew at the rear end of the train signaled for the train to move; and that, while Potterfield was stationed at the rear of the train, defendant's foreman gave a back-up signal for the movement of the train, without first receiving a signal for such movement of the train from Potterfield or another member of the switching crew stationed at the rear of the train. In requiring the jury to find these specific facts, this instruction properly submitted the plaintiff's theory of recovery, as pleaded in her petition and as proven by the evidence in the case. And, since the part of the instruction attacked was connected with the other parts of the instruction conjunctively, by the word *"and,"* the jury could not have found for the plaintiff without finding the specific facts, relating to the foreman's failure to exercise ordinary care. For this reason, that part of the instruction which required the jury to find "that defendant's foreman in charge of defendant's switching crew failed to exercise ordinary care" was not prejudicial to defendant. This court and our courts of appeals have uniformly held that, if a plaintiff or a defendant

assumes an extra burden, in their instructions, it is not an error of which the loser can complain. [McKenzie v. Randolph, 257 S. W. (Mo.) 126; McIntyre v. Railroad, 227 S. W. (Mo.) 1047; Kendrick v. Ryus, 225 Mo. 150, 123 S. W. 937; Berry v. Railroad, 214 Mo. 593, 114 S. W. 27; Harrington v. City of Sedalia, 98 Mo. 583, 12 S. W. 342; Houston v. Foundry Co., 282 S. W. (Mo. App.) 170; Bauer v. Fahr, 282 S. W. (Mo. App.) 150; Troutman v. Oil Co., 224 S. W. (Mo. App.) 1014; Gibler v. Railroad, 129 Mo. App. 93, 107 S. W. 1021.]

III.  It is asserted in the motion for a new trial that the verdict of $22,750 is excessive, that the size of the verdict was prompted by passion and prejudice on the part of the jury, and that the jury was prejudiced by the error of the trial court in permitting plaintiff, while on the witness stand, to point out the two minor children of deceased in the court room.  In their brief, counsel for defendant have contented themselves with the mere assertion that the verdict is excessive and that the size of the verdict is sufficient proof of the jury's passion and prejudice, without any suggestions as to the facts or controlling authorities.  We take it, therefore, that these complaints are not seriously urged.  At the time of the unfortunate occurrence which resulted in Potterfield's death, he was not quite forty-two years of age.  His average monthly wages were about $180. Of this amount, plaintiff estimated that about $30 per month would cover his share of the household expenses in "food, clothing and rent."  The balance of $150 monthly, or $1800 annually, was "used" for the support of plaintiff, his wife, and their two minor children. These figures were not disputed.  The condition of Potterfield's health does not directly appear, but the character of his employment, as a railroad switchman, and his steady employment, as indicated by his average monthly wages, tend to show that his general health was good.  At least, there was no showing to the contrary.  "His only bad habit was smoking."  Plaintiff, his wife, was a little more than thirty-eight years of age at the time of his death.  The petition states the ages of his children at twelve years and nine years, respectively. Their ages were not shown in the evidence, but they were pointed out to the jury and they were observed by the jury in the court room.  We have in mind the extra hazards of Potterfield's employment and the further fact that there is no element of pain or suffering in the case.  In three comparatively recent cases, this court has carefully considered the measure of damages, in dealing with facts and figures very close to the facts and figures in this case. These cases are Shaw v. Railroad, 314 Mo. 123, 282 S. W. 417; Kidd v. Railroad, 274 S. W. (Mo.) 1079; Gill v. Railroad, 302 Mo. 317, 259 S. W. 93.  It should suffice to say that, in view of the holdings in the cases mentioned, we have concluded that the verdict in this case

is not excessive. It was not error for the trial court to permit plaintiff to point out her minor children, while she was being interrogated concerning the family situation, because this suit was brought and was then being prosecuted for the benefit of the children as well as the plaintiff. We find nothing to support the charge that the verdict resulted from passion and prejudice on the part of the jury.

No error appearing in the record, the judgment is affirmed. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.