O. C. LILES, Plaintiff, LAW UNION & ROCK INSURANCE COMPANY, a Corporation, Intervening Plaintiff, Respondents, v. ASSOCIATED TRANSPORTS, INC., a Corporation, Defendant, Appellant, No. 41029—220 S. W. (2d) 36.

Division One, May 9, 1949.

88

*Jas. T. Blair, Jr., Geo. O. Durham, Will B. Dearing* and *Fred L. Hurley* for appellant; *Robert C. Hyde* and *H. K. Wangelin* of counsel.

*Charles Liles, Ted M. Henson* and *Ward & Reeves* for respondent O. C. Liles.

*Frank Lowry* for intervenor-respondent Law Union & Rock Insurance Company.

DALTON, C.—Action for damages for personal injuries sustained when plaintiff's automobile collided with defendant's truck. Intervenor, as assignee of plaintiff, seeks to recover the damages to plaintiff's automobile, since payment therefor was made to plaintiff under a policy insuring against damage by collision. Verdict and judgment were for plaintiff for $37,500 and for intervenor for $1105.00. Defendant has appealed. Error is assigned on the refusal of defendant's requests for directed verdicts, on the giving and refusal of instructions and on an alleged excessive verdict for plaintiff.

The cause was submitted to a jury on alleged negligence of defendant under the humanitarian doctrine in failing to stop or swerve its truck to the right and avoid a collision. Appellant contends that "plaintiff offered no evidence as to the distance within which he

might have stopped'' his automobile; that "the time when his peril became imminent is left to conjecture"; and, that "he therefore failed to make a submissible case on humanitarian negligence." The argument is based on the recognized theory that a situation of imminent peril is the basic fact of the humanitarian doctrine; and that no duty whatever arises under that doctrine unless and until a situation of imminent peril comes into existence. Steuernagel v. St. Louis Pub. Serv. Co., 357 Mo. 904, 211 S. W. (2d) 696; Blaser v. Coleman (En Banc), 358 Mo. 157, 213 S. W. (2d) 420.

The collision occurred on U. S. Highway No. 67, near Neeleyville, in Butler County. The highway was straight and level and the concrete pavement 20 feet in width, with a 10 foot earth shoulder on either side. Immediately east of and adjoining the highway was a commercial development with three business places fronting west on a graveled areaway some 400 feet in length. Beginning at the north was a filling station and a garage, then a restaurant and, at the south, a liquor store. Three graveled drives entered the areaway from the highway.

Defendant's outfit consisted of a Ford truck chassis designed for school bus purposes. It was somewhat larger than the ordinary truck chassis and had dual rear wheels, the usual hood and brakes, no rear fenders and no cab or body. A seat for the driver was fastened to the frame. A second chassis of the same type was attached to the first in semi-trailer fashion with the front end mounted on the rear of the first chassis. The total length of the vehicle (tractor and trailer) was 42 feet. Two of these outfits, each with its own driver, were proceeding from Lima, Ohio to Conway, Arkansas.

About 9:30 a. m., March 23, 1947, the first unit pulled in and parked near the restaurant mentioned above. The driver of the second unit slowed down and pulled off on the right shoulder, but was going too fast for either the first or second drive, and undertook to turn left (east) into the third drive, 135 feet beyond the second drive. As this unit (referred to as a truck) turned to the left across the highway, it blocked the path of plaintiff's automobile, which was proceeding south on the same highway and was attempting to pass. Plaintiff's automobile (hereinafter referred to as a car) struck the left rear side of the tractor section near its rear wheels, broke it loose from the semi-trailer section and turned it over into a ditch on the south side of the drive. As the truck and car had approached the commercial development in question, both caught up with and passed around the automobile of one McCauley, who was traveling in the same direction, and then, when the driver of the truck decided to turn left into the third drive, he looked back, saw what he said was the McCauley automobile safely to his rear, and turned left across the highway. He did not see plaintiff's car until he saw it swerve and skid immediately before the collision.

Plaintiff testified that, after the truck pulled around McCauley, the truck driver pulled "clear off" the road "quite a ways down the road in front of me . . . and I thought he was bringing the truck to a stop and I went around McCauley and attempted to pass the truck." The truck had passed two wide gravel driveways and was on the west shoulder of the road, with only its left rear wheel still on the pavement. Plaintiff's car was "about the center of the highway and had just passed McCauley and pulled over." The high-way ahead was clear and plaintiff was traveling 45 to 55 miles per hour. Plaintiff saw the truck when it first started to turn to the left, but he had already sounded his horn and "had already started around." He did not know exactly how close he was to the rear of the truck, probably 150 feet back, "approximately 150 to 200 feet back," when he saw the truck start to turn. "Naturally I thought he was going to stop and I veered over to the center and left side of the pavement and applied my brakes. . . . When he came on across I veered to the right side but he was completely across the highway." Plaintiff "had probably slowed down to 30 to 35 miles an hour" before the impact. The truck wasn't blocking the highway when plaintiff was 150 to 200 feet back, but plaintiff put his brakes on just as soon as the truck started across in front of him. He was trying to stop his car, but he traveled "a certain distance" before he could get his foot off the accelerator and on to the brake. He thought he skidded the wheels for a distance of about 20 feet.

McCauley's testimony tended to show that when the truck turned out on the highway, plaintiff's car was between McCauley and the truck. McCauley saw the wheels of plaintiff's car sliding immediately before the collision and knew the brakes were on, the whole road was blocked and plaintiff could not have avoided the collision by going either to the right or to the left.

Plaintiff's wife, who was with him, testified that they had passed a "car and straightened up and right ahead of us we saw a vehicle pulled off the highway as if to stop." Just as plaintiff started or swerved out a little bit to the left to pass and speeded up to pass, the truck "started to pull off" and "came directly across the high-way." Plaintiff was far enough back for the truck to get across and block the highway before the collision.

For defendant, the truck driver testified that the front end of his truck and the *left* front wheel were off the east edge of the pavement at the time of the impact. He didn't know whether the right front wheel was off or not. He fixed his rate of speed on the left turn at about 15 miles per hour. Defendant's other driver fixed plaintiff's speed at 60-70 miles per hour and the truck's speed on the turn at 15 miles per hour, but admitted he had probably testified before that the truck's speed was about 5 miles an hour, or between 5 and 10 miles an hour. On cross examination, he fixed the speed at between

5 and 10 miles per hour, "a low rate of speed." Another witness for defendant fixed the speed of the truck on the ▇ turn at 10-15 miles per hour and said he heard plaintiff's "brakes scream," when the car was 20 to 30 feet from the truck. The truck crossed the pavement somewhat at an angle, not a sharp turn to the left. When the truck started its left turn, and even after both front wheels were on the pavement, it could have been swerved or turned right and proceeded down the highway. We do not construe the words "going straight across," used in cross examination of plaintiff, to mean that this tractor-trailer outfit, some 42 feet in length and traveling on the right shoulder, could have turned and moved "squarely across the pavement."

Plaintiff's evidence tended to show the truck in question, at 15 miles per hour and under the circumstances shown, could have been stopped in 12 feet and plaintiff offered to show that at 5 miles per hour it could have been stopped in 4 to 7 feet and at 10 miles per hour in 10 feet. The offer was refused. None of plaintiff's witnesses fixed an exact speed for the truck in turning and crossing the pavement.

▇ While there was no direct evidence as to the distance within which plaintiff's car could have stopped at the speed it was traveling when the truck began its turn to the left, the evidence does show that plaintiff saw the truck the instant it began its turn to the left and that he immediately applied the brakes and tried to stop, but that the car could not be stopped before the collision. The evidence further shows that defendant's witness, the driver of the first unit, recognized that plaintiff was in imminent peril the moment the truck began to make its left turn. The witness testified: "I was excited when I saw this car coming too fast to stop." Witness had seen the truck "in preparation of a left turn," and knew of the driver's intention to turn in the south driveway. He said: "I thought I hollered 'No' as hard as I could, the one word 'No' " meaning "No, don't turn left." "I couldn't see anything except there was going to be an accident . . . ." Appellant argues that "the fact that the (plaintiff) didn't stop is no evidence he couldn't stop." We think the evidence shows not only that plaintiff didn't stop, but that he could not stop within time after the truck began its left turn. Although plaintiff was not in and never came into the path of the truck, we think the evidence sufficiently shows that plaintiff came into imminent peril the moment the truck driver, wholly oblivious of plaintiff's approach, began to turn the truck to the left with the intention of proceeding across the highway. Teague v. Plaza Express Co., 354 Mo. 582, 190 S. W. (2d) 254; Vandenberg v. Snider (Mo. App.), 83 S. W. (2d) 201.

▇ The next question, mentioned only in argument, is whether defendant's driver, thereafter, by the exercise of the highest degree

of care, and *with safety to himself*, could have stopped the truck or swerved it to its right and prevented the collision. Spoeneman v. Uhri, 332 Mo. 821, 60 S. W. (2d) 9, 11. Appellant's argument proceeds on the theory that the collision became unavoidable before the whole pavement was blocked; that the truck was traveling 15 miles per hour and could not be stopped in less than 12 feet; and that, if the truck could not be stopped in less than 12 feet, only 8 feet or less of the northbound lane would have been open for plaintiff's passage and the collision could not have been avoided *with safety* to defendant's driver, since the driver's safety would depend solely upon plaintiff's ability to get his car through the remaining 8 feet or less of space. We think the issue of whether the driver could have stopped the truck or swerved it to the right "with safety to himself" was for the jury. There was evidence from which the jury could infer and find that the rate of speed of the truck did not materially exceed 5 miles per hour and, therefore, that it could be stopped in much less than 12 feet; and that the car traveled 150 to 200 feet (plus the length of the truck) while the truck was traveling less than 25 feet. No direct evidence was offered to show that an attempt to stop the truck would have increased the truck driver's peril, or that he was seeking to get across to avoid any peril, he being wholly oblivious of plaintiff's approach until immediately before the collision. Brown v. Callicotte (Mo. Sup.), 73 S. W. (2d) 190. The issue of appellant's humanitarian negligence in failing to stop or swerve the truck to the right was for the jury. Teague v. Plaza Express Co., supra.

[41] Error is assigned on the giving of Instruction No. 1-P. It is contended (1) that the submission of humanitarian negligence was unauthorized by the evidence for the reasons assigned; (2) that the instruction erroneously "invited the jury to find the collision occurred while the cars were passing, contrary to the evidence"; (3) that "it purported to cover the whole case, but did not require the jury to find appellant's alleged failure to stop or swerve was the proximate cause of the collision"; (4) that it was misleading and erroneous in directing a verdict against appellant if its negligence "contributed" to cause the collision; and (5) that it "erroneously excluded appellant's theory that plaintiff's negligence was the sole cause of the collision."

The first contention is overruled for the reasons hereinbefore stated. The second contention is overruled for the reason that the testimony shows respondent was in fact undertaking to pass the truck when the collision occurred. As to the third contention, the instruction expressly required a finding that the truck driver "could have stopped said motor truck, or could have swerved the same to the right, and that by doing either one or the other of the aforesaid things, the said defendant's agent, servant, and employee, could thus

and thereby have avoided the collision . . '. and could have prevented injuring said plaintiff . . .." The instruction further required a finding that the truck driver "negligently failed to use such highest degree of care, and that as a direct result thereof" the truck and car collided "and that such negligence, if any, caused or contributed to said collision, and that as a result thereof the plaintiff was thereby injured." The instruction sufficiently required a finding that the failure to stop or swerve was the proximate cause of the collision and the instruction did not invite a finding for plaintiff "on general negligence in unspecified particulars." Potterfield v. Terminal R. Ass'n., 319 Mo. 619, 5 S. W. (2d) 447, 452(5, 6). The alternative submission, "or contributed" as used in the instruction, was not erroneous or misleading. See, Evans v. Klusmeyer, 301 Mo. 352, 256 S. W. 1036, 1038; Browne v. Creek, 357 Mo. 576, 209 S. W. (2d) 900, 904. In certain cases the use of these words in instructions submitting primary negligence has been condemned where no other cause than plaintiff's contributory negligence, as submitted, appeared, but we have found no case holding their use to be erroneous in a humanitarian negligence submission where contributory negligence is no defense. .

As to the fifth contention, Instruction No. 1-P directed a verdict for plaintiff "even though you may find and believe from the evidence that plaintiff . . . was negligent and failed to use proper care and caution for his own safety and was negligent and careless in getting into the position of peril at the time of the collision." In this connection appellant requested two sole cause instructions 2-D and 4-D, which were refused and their refusal is assigned as error. These instructions would have submitted, as the sole cause of the collision and injury, plaintiff's negligence in driving his car "at a rate of speed which was high, excessive and dangerous under the conditions then and there existing and in failing to keep a lookout ahead for vehicular traffic on said highway and in failing to have his car under control so as to prevent and avoid" collision with defendant's truck. A finding for defendant was directed without any required finding that the defendant was not guilty of the specific negligence charged against him under the humanitarian doctrine and submitted in Instruction 1-P. The instructions were properly refused. Bootee v. Kansas City Pub. Serv. Co., 353 Mo. 716, 183 S. W. (2d) 892, 897; Jants v. St. Louis Pub. Serv. Co., 356 Mo. 985, 204 S. W. (2d) 698. We need not consider other objectionable features of these instructions. No proper sole cause instruction was offered and we think there was no substantial evidence upon which to base a sole cause instruction. The evidence upon which Instructions 2-D and 4-D was based was the evidence of plaintiff's antecedent contributory negligence, which did not constitute a defense. Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 111 S. W. (2d) 54, 59;

Weis v. Melvin, No. 40585, 219 S. W. (2d) 310, not. published in the State Reports. There was no error in giving Instruction 1-P.

[42] Appellant contends that plaintiff's Instructions No. 2-P on the measure of damages is erroneous; that it "gives the jury a roving commission to allow plaintiff for his loss of time and service," his inability to earn a livelihood and his "medicines and medical" expenses. Appellant further says the instruction did not sufficiently explain the source of the figure $75,000, mentioned therein, which was the amount sued for, and that the jury might reasonably consider the mentioning of the amount as a comment on the evidence.

The instruction did not give a roving commission merely because it told the jury it should take into consideration plaintiff's "loss of time and service and his inability, if any, resulting from said injuries to earn a livelihood for himself . . . and his necessary expenses for medicines and medical attention." The matters mentioned were sufficiently shown by the evidence, as we shall see, and without objection, and they were properly referred to. State ex rel. State Highway Commission v. Haid, 332 Mo. 606, 59 S. W. (2d) 1057, 1060. Although mentioning of the amount sued for without explaining the source of the figure has repeatedly been criticised by this court, we do not find that it has been held reversible error to do so. Bond v. St. Louis & San Francisco R. Co., 315 Mo. 987, 288 S. W. 777; Thompson v. City of Lamar, 322 Mo. 514, 17 S .W. (2d) 960. Nor was the mentioning of the amount sued for reversible error under the circumstances shown by this record. Lessenden v. Missouri Pac. R. Co., 238 Mo. 247, 264, 142 S. W. 332.

Was the verdict excessive? Respondent's legs were caught in the wreckage of his car and, after he was released by aid of a crowbar, he was unable to walk, had various contusions and abrasions over his face and body and was "obviously suffering from shock and painful physical injuries." Two days passed before he had sufficiently recovered to undergo surgery. Examination of his right leg disclosed a spiral fracture of the big bone and that the smaller bone was broken 3 inches above the ankle. On the lateral side of the right ankle joint, "the lower end of the fibula or small end bone in the ankle was broken off." The fractures were reduced and the leg extended by the use of pins at the knee and ankle and the bones were gotten in good position and alignment with the aid of plaster casts. The fractures have healed and considerable callus has been deposited. Recent X-rays of the ankle show considerable atrophy of the bone and some absorption along the heel. There is "an obvious arthritic change in the ankle joint" due to trauma and respondent has developed flat feet. The arthritic conditions are of a permanent nature and the injury to the bone is permanent. Respondent also suffered a simple fracture of the left knee cap, with three parts to the fracture. The fracture has apparently healed, but a fragment of bone

is detached and he suffers pain and discomfort of a minor nature from this injury. No bones were broken in the left ankle, but the ankle was sprained and there was considerable swelling and hemorrhage within the ankle. Respondent now has a partial permanent disability in his right lower extremity and to a minor degree in his lower left extremity. His legs and ankles continue to swell and are very painful. Treatment by manipulation and the application of heat is required. The process of healing has been most painful and the injuries and resulting pain have caused a certain degree of nervousness which interferes with rest. He will continue to suffer pain in his right ankle. In August 1947, he began to walk with the aid of crutches and by the end of March 1948 could walk some without crutches ''by steadying himself on things.'' In addition to the knee and ankle injuries, respondent suffered considerable bruises of the chest. Pressure on the chest from the lateral, front, or back side caused pain and he complained of pain on respiration and coughing. He was put in a plaster cast and so remained until May 16, 1947. For over six weeks he lay on his back and couldn't turn over either way and was given morphine every three hours. He was in the hospital two months and four days and then a new cast was put on that was not removed for six weeks.

For many years respondent had been engaged in the cleaning and pressing business and selling men's suits. His wife worked with him in the business and six others were on the payroll. He personally did some pressing, cleaning, waiting on customers, soliciting business, collecting accounts, measuring for suits and attending to other duties. He was 45 years of age and had an expectancy of 25.21 years. At the time of the trial he had not yet been able to resume even the supervision of his business and was confined at home. Without objection he was permitted to show that, after he was injured, he found it necessary to bring his two sons home from college and put them to work in handling his business for him at $200 per month each. The cost of hiring these substitutes was some evidence of the value of his loss of time. Hoffman v. Southern Pac. R. Co., 101 Cal. App. 218, 281 Pac. 681. Also see, State ex rel. United Rys. Co. v. Reynolds, 257 Mo. 19, 38, 165 S. W. 729. Respondent estimated he had lost in one year, due to the increased cost of the operation of his business occasioned by his absence, some $6000, in addition to a 15 to 20 percent reduction in the sale of suits each season. His hospital and medical bills on account of his injuries had amounted to $1160.19 at the date of the trial and he had not been released from further medical treatment. The jury could infer the necessity and value of these items from the facts shown.

No two cases are alike and each case must be considered upon its own peculiar facts. The evidence must be considered in a light favorable to respondent and we must give some consideration to changed

economic conditions and to verdicts awarded and permitted to stand in cases where the injuries were at least somewhat similar. O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085, 1092; Goslin v. Kurn, 351 Mo. 395, 173 S. W. (2d) 79, 89. Leg and foot injuries have been considered in many cases, but there are few cases where both extremities have been injured and the other injuries and damages are closely similar to those appearing here. Appellant cited no authorities in support of this assignment of error and respondent has referred to large verdicts without reference to similar injuries. However, see Hill v. Terminal R. Ass'n. (En Banc), 358 Mo. 597, 216 S. W. (2d) 487; O'Brien v. Vandalia Bus Lines, 351 Mo. 500, 173 S. W. (2d) 76; McNatt v. Wabash R. Co., 341 Mo. 516, 108 S. W. (2d) 33; Hiatt v. Wabash R. Co., 334 Mo. 895, 69 S. W. (2d) 627; Harlan v. Wabash R. Co., 335 Mo. 414, 73 S. W. (2d) 749; Miller v. Collins, 328 Mo. 313, 40 S. W. (2d) 1062; Christopher v. Chicago B & Q R. Co. (Mo. Sup.), 55 S. W. (2d) 449.

We think the verdict is excessive, but the error may be cured by remittitur. On the record presented the verdict may not be approved for more than $20,000. If respondent will remit $17,500 within fifteen days, the judgment in his favor will stand affirmed as of the date of its rendition for $20,000. Otherwise the judgment will stand reversed and the cause will be remanded for a new trial.

We now consider appellant's appeal from the judgment entered in favor of intervenor. Error is assigned on the alleged refusal of a directed verdict for appellant and on the giving of Instruction No. 1-A. Appellant says that no case was made for the jury under the humanitarian doctrine; and that there was no "evidence from which the nature and extent of loss or damage or the pecuniary value" of the automobile could be determined. Appellant complains of the failure to inform "the jury of the measure of recovery, namely the difference in value before and after the accident"; and insists that the instruction invited the jury to find the collision happened on March 30, instead of March 23, 1947. The motion for a directed verdict, "overruled both as to plaintiff . . . and intervenor," requested a directed verdict only "upon the cause of action alleged in plaintiff's petition," intervenor's claim was not mentioned therein.

Intervenor's petition alleged the issuance of a policy of collision insurance to plaintiff on a 1942 Plymouth Sedan, damage to the car by collision "to the extent of $1105.00," the payment of this amount by intervenor to plaintiff, the subrogation of intervenor to plaintiff's right against those causing the damage and a prayer to recover, as subrogee, from defendant the amount paid to plaintiff. The allegations in plaintiff's petition concerning defendant's negligence and the resulting collision on March 23, 1947 were re-alleged and adopted by reference. On October 11, 1948, long after the judgment appealed from was entered, the parties stipulated that the record

should show service on defendant; and that defendant's answer to the original petition "should be considered as filed and made applicable to the intervening petition." This answer contained specific denials of the re-alleged and adopted portions of plaintiff's petition, but no general denial and, accordingly, it specifically denied only the matters adopted by reference. The allegation that plaintiff's 1942 Plymouth Sedan was "damaged to the extent of $1105.00," although not specifically denied, was not admitted. Laws 1943, p. 371, Sec. 41; Sec. 847.41 R. S. A.

The evidence in support of the claim showed the facts hereinbefore stated; and that plaintiff's car was wrecked and damaged. Pictures showing the car's damaged condition after the collision were offered and received in evidence without objection. Plaintiff testified concerning the issuance of the policy to him by intervenor; that after the collision, an adjuster paid him $1105.00 for the damage to his car; that settlement was had on the basis of a total loss; that he, plaintiff, had not seen the car since the collision; and that, when he received the payment, he had signed the subrogation receipt and agreement which was exhibited and offered in evidence. This receipt referred to the collision as happening March 30, 1947 and recited full settlement of all claims for loss and damage for $1105.00. No objection was made thereto on any ground. There was evidence that the physical condition of the car after the collision showed the effect of "a terrific impact." No direct evidence was offered as to the age of the car, its value before or after the collision, the extent of pecuniary damage thereto, or the cost of repairs therefor.

█ Although the intervening petition and the subrogation receipt referred to the collision as occurring on March 30, 1947; the oral evidence showed the collision occurred on March 23, 1947, and that the intervenor paid plaintiff $1105.00 for the loss and damage to his car resulting from such collision. Instruction No. 1-A required a finding that the insurance was in force and effect prior to March 23, 1947; and that the damage resulted "from the collision alleged in the petition in this matter." We do not believe the jury could have been misled or appellant prejudiced by the reference mentioned. While the pecuniary amount of the damage to the car was not admitted, the amount alleged was not denied. The issues of negligence and liability, which were specifically denied, were tried to the jury as the contested issues between the parties. We have held that the issue of humanitarian negligence was for the jury. The amount of pecuniary damage to the car, not specifically in issue, was not tried. The physical damage, apparent from pictures admitted to be correct, was in effect conceded. Under the circumstances mentioned, we think the absence of direct evidence "as to the extent of damage done . . . or the pecuniary amount thereof" was immaterial. Apparently the matter was not in dispute. Wilkinson v. St.

Louis Southern R. Co., 146 Mo. App. 711, 125 S. W. 544. On the trial theory it was not necessary to inform the jury of the true measure of recovery, as the difference in value before and after the collision. Sinclair Refining Co. v. Wyatt, 347 Mo. 862, 149 S. W. (2d) 353; Allen v. Purvis (Mo. App.), 30 S. W. (2d) 196, 200. The instruction, which authorized a recovery of property damage "not to exceed the sum of $1105.00," has defects, but we do not consider it erroneous or prejudicial in the respects complained of.

The judgment in favor of intervenor is affirmed. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.