Elsie Fern TRYON and Walter Tryon,
Appellants,

v.

Mary N. CASEY (Howerton), Respondent.

No. 24591.

Kansas City Court of Appeals.

Missouri.

April 3, 1967.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 5, 1967.

Alan Slayton, Reese, Constance, Slayton, Stewart & Stewart, Independence, for appellants.

Houts, James, McCanse & Larison, Richard P. Bruening and Ralph H. Smith, Jr., Kansas City, for respondent.

CROSS, Judge.

Plaintiffs Elsie Fern Tryon and her husband Walter Tryon jointly maintain this suit in two counts against defendant Mary N. Casey (Howerton). Count one is an action by Mrs. Tryon for damages on account of personal injuries received when her standing automobile was struck in the rear by an automobile driven by defendant.

Count two is plaintiff husband's suit for damages arising from his resulting loss of services. The case was tried before a jury which returned a $250.00 verdict on the first count for Mrs. Tryon and a $700.00 verdict for Mr. Tryon on the second count. Plaintiffs have appealed from the resulting judgment.

The collision occurred on the morning of October 30, 1963 at a street intersection in Independence and involved four automobiles traveling in line behind a school bus. Plaintiff, on her way to her regular work, had been driving northbound approaching the intersection behind two cars which were immediately following the bus, all vehicles traveling in the same lane. The school bus flashed its lights as it approached the intersection and came to a stop to pick up school children. The two vehicles in front of plaintiff and the car driven by plaintiff made a gradual stop. "Everybody made a gradual stop". Plaintiff came to a stop approximately ten feet behind the vehicle immediately in front of her. Within a few seconds after she had been stopped an automobile driven by defendant struck the back of her car, causing it to hit the car immediately in front of her, which in turn ran into the car it was following. Thomas Sugg, a police officer called to the scene of the accident, testified as a witness produced by plaintiffs that he found the four cars still parked on the street and that all of them were damaged. Defendant's car was the last in the row of cars. Immediately in front of it was Mrs. Tryon's car. The entire front of defendant's car including the bumper, both fenders, and the hood was "heavily damaged". The car was not driveable and was removed by a tow truck. Mrs. Tryon's car was damaged on the rear. "The trunk was bent in and the tail lights, the rear bumper was buckled." The front left part of the Tryon car also was damaged where it had struck the car immediately in front of it (the second car in line) and inflicted damage to its rear bumper and trunk. That vehicle was further damaged in front when it was driven into the first car in line which thereby sustained damage to the rear "on the bumper and the tail light was broken". The persons involved in the accident were removed to the hospital by ambulance. The officer did not talk to them at the scene, but did so later at the hospital. The defendant gave him a statement that "she was driving along and glancing out the window and her brother yelled at her to stop and when she looked up she bumped into the other cars". Other testimony of the officer will be referred to later herein.

Defendant's version of the muliple collision corroborates the foregoing stated facts. She testified that on the morning in question she was driving an automobile to school accompanied by her brother. As she approached the intersection at a speed of 15 to 20 miles per hour there was traffic in front of her, consisting of a bus in front of some cars. While she was glancing "out the window" her brother yelled a warning that cars were stopped ahead. She put on the brakes but didn't stop in time to avoid striking Mrs. Tryon's vehicle. The force of the impact knocked the Tryon car into the car next in front, and so completely "smashed in" the front of defendant's car that it couldn't be driven away from the scene of the accident. No serious effort was made on defendant's behalf to establish that the collision resulted from any cause other than her own negligence.

The real trial issues contested were as to the extent of Mrs. Tryon's injuries, the quantum of pain and disability resulting therefrom, and the amount of damages plaintiffs should receive. Bearing on these questions Mrs. Tryon testified in substance as follows: After the collision she was dazed and became nauseated. By the time she got to the hospital she began to get stiff and sore and suffer pain in her neck and back and her knees. At the hospital she was X-rayed, examined and prescribed for by Dr. Link, her family physician. Mr. Tryon then drove her home. She remained nauseated and threw up several times. She was confined to her bed the rest of the

day and most of the following day because of being stiff and sore. On the third day she went to Dr. Link and complained to him of stiffness and soreness in her neck and back, for which he gave a series of heat treatments and also cortisone injection. She remained generally under the charge of Dr. Link until April, 1964, and continued to have the same complaints of pain in her neck and back during this whole period of time. Sometime in November or the first part of December following the injury she noticed a new development—a numbness of her right arm which still persists along with her pain and difficulty with her neck and the upper part of her back. Sometimes the numbness is accompanied by headaches, and it is brought on by having her neck in "a bind" or in an unusual position, such as "when she had her head down or up". Through December and January she consulted and received treatments for her conditions described previously, from Dr. John Meise, a chiropractor. Dr. Link had made arrangements for her to enter the hospital but no rooms were available. For that reason she started going to Dr. Meise because "I wasn't getting any relief from this terrible headache and pain in my neck". She also consulted Dr. Robert Finkle, an orthopedic specialist, in March, 1964. She was referred to him by Dr. Link because of the numbness and pain in her arm and neck. Dr. Finkle gave her a cortisone injection and referred her to the Independence Sanitarium and Hospital for a series of neck traction treatments.

Mrs. Tryon testified that because of the numbness and pain in her arm she is unable to do anything like ironing, sewing or bowling, "anything in which my head is down". She has lost control of her hand and drops things, such as a ball or a paint brush. She has discontinued bowling in "the league", and no longer does her own interior decorating which she formerly did. For two weeks following the accident she was unable to do any housework and for five months thereafter she had to have extra help with her housework. Her two girls are "carrying the load right now" with reference to her "regular household duties, washing and cooking". Prior to the accident Mrs. Tryon worked regularly at the "Rapid Car Wash", a business owned by Mr. Tryon devoted to washing, cleaning and polishing automobiles for automobile dealers and the public. She had operated the office and assisted generally in various operations of the business. After her injury in October, 1963, she did not return to those duties until April, 1964. She still complains of numbness of her arm, pain that shoots down through her arm, and that her arm goes dead "like a piece of wood". She still has "difficulty" with her neck and the upper part of her back which originated with the accident.

Total expenses incurred as a result of the accident, not inclusive of wages paid replacement help at the car wash, amounted to $698.94, were paid by Mr. Tryon, and were as follows: ambulance, $15.00; Dr. Vance Link, $60.00; Independence Sanitarium and Hospital, $53.00; Dr. John Meise, $75.00; Dr. Robert Finkle, $25.00; miscellaneous drugs, $28.94; heating pad, $10.00; having ironing sent out, $220.00; housework done by Mrs. Tryon's mother, $100.00; Mary Engle (housework and odd jobs), $112.00. It was also developed by Mrs. Tryon's testimony that on July 12, 1962, she was involved in an accident prior to the one giving rise to this suit. The 1962 occurrence was also a rear end collision. Mrs. Tryon was hospitalized at the Independence Sanitarium for eight days where she was treated for injuries similar to those received in the October 1963 collision. She testified that within a month after the 1962 accident she had recovered, was symptom free and had no medical service. She was off work at the car wash only ten days. Also, in the latter part of 1965 she was involved in a minor car accident and received injury limited to her *left* shoulder on that occasion. She was taken to the Independence Sanitarium and Hospital where Dr. Robert Finkle examined her and evaluated X-rays that were taken of the injured

area. She later saw Dr. Finkle four times on account of the injury to her left arm and was off work following that injury only from "Monday until Friday". She states she entirely recovered from and has no residual disability from the 1965 injury to her left shoulder. Additional evidence material to the appeal issues will be referred to in our discussion of the points raised.

Plaintiffs' first point is a contention that the trial court erred in refusing to admit as evidence those portions of the office records of Dr. Robert Finkle which contained his findings and diagnosis resulting from his examination of Mrs. Tryon. The records in question were produced at the trial by Dr. Finkle's receptionist, June Wingo, who testified that she maintained and was custodian of all the records pertaining to the doctor's treatment and examination of patients. Counsel for defendant interrupted preliminary examination of the witness to admit identity of the documents as business records, reserving the right to object to specific portions thereof on grounds other than their qualification for admission in evidence under provisions of the Uniform Business Records Act. The court then ruled that "They will be admitted on that basis". Plaintiffs' counsel then asked the witness to read into the record those portions of Dr. Finkle's records which showed what complaints were made to him by Mrs. Tryon and reflected the doctor's subsequent examination and findings. Defendant's counsel interposed objection to the requested evidence on the specific ground that it woud be hearsay since there was no showing that the doctor was not available to testify in person. The objection was sustained. Thereupon plaintiffs' counsel made an offer of proof as follows: "MR. SLAYTON: I would like to prove by this witness through the doctor's medical records that the patient has an abduction of the right shoulder, of a joint, that there was pain that accompanied the abduction; that the abduction of the right arm against resistance aggravated the pain; that she had pain along the right side of her

neck along the trapezius muscle into the right shoulder". Again defendant's counsel objected to the offer "on the ground it is hearsay and not the best evidence", and that "it deprives the defendant of the right of cross examination". The objection was sustained by the court.

██ It is apparent from the foregoing that the sole reason actuating the trial court in excluding the records of Dr. Finkle was that such evidence would be hearsay. Their identification and qualification as business records were not questioned, nor was any objection made as to their relevancy or materiality or interposed on any other substantive ground. It is uniformly held by Missouri decisions that properly qualified business records are admissible as evidence, subject to specific and legally proper objection *on grounds other than hearsay*. In Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663, 55 A.L.R.2d 1022, Judge Eager wrote: "Objections to such records as hearsay and as depriving a party of the right of cross-examination are, therefore, not effective if the records have been properly qualified under the Uniform Business Records Act. * * * Since the hearsay objection is obviated, we see no reason why a proper expert medical opinion contained in a hospital record should not be accorded dignity equal to that of a similar opinion from the witness stand; to preserve the right of cross-examination intact as to such matters would be to repeal the statute". See also: Rossomanno v. Laclede Cab Co., Mo.Sup., 328 S.W.2d 677; LaMantia v. Bobmeyer, Mo.App., 382 S.W.2d 455; Glynn v. Glynn, Mo.App., 291 S.W.2d 190 and 12A Mo.D., Evidence, ██ The medical records of Dr. Finkle offered as evidence in this case come within the foregoing rules we have noted. The professional office records of physicians are within the purview of the Business Records as Evidence Law and upon proper identification and qualification are admissible in evidence. Rossomanno v. Laclede Cab Co., Mo.Sup., 328 S.W.2d 677; Fisher v. Gunn, Mo.Sup., 270 S.W.2d 869;

LaMantia v. Bobmeyer, Mo.App., 382 S.W. 2d 455; Kitchen v. Wilson, Mo.Sup., 335 S.W.2d 38. Clearly, the exclusion of the office records of Dr. Finkle on the ground that they were hearsay constituted error.

Defendant makes no effort to justify the trial court's exclusion of Dr. Finkle's office records on the ground they were hearsay. She relies on an entirely different ground presented here for the first time, to-wit: that the trial court correctly refused to admit the records because there is no evidence to indicate that Dr. Finkle was a medical expert qualified to make medical findings and diagnoses. In this connection we are mindful of the rule that an "expert witness" is one who by reason of education or specialized experience possesses superior knowledge respecting a subject about which persons having no particular training are incapable of forming an accurate opinion or of drawing correct conclusions. 12A Mo.D., Evidence, Our examination of the record does not lead us to the conclusion defendant contends for. To the contrary, it discloses facts and circumstances amply sufficient to warrant our belief that Dr. Finkle was a medical expert, qualified to speak as an authority on matters relating to disability of the human body.

The following are significant facts bearing on the professional identification and status of Dr. Robert Finkle. His first professional contact with Mrs. Tryon was instigated by Dr. Link, her family physician, whose identity and qualifications as *a doctor of medicine* are thoroughly established by the evidence and are unquestioned. Dr. Link testified that he received his medical education at the University of Nebraska College of Medicine, graduating in 1942. He interned at the University Hospital in Omaha until 1943. He was admitted to practice in Missouri in 1943 and, as previously stated, he is at the present time associated with the Independence Sanitarium and Hospital in the practice of general medicine and is not an orthopedist.

In March, 1964, Dr. Link "referred" Mrs. Tryon to Dr. Finkle, as an orthopedic specialist, for treatment of the numbness and pain which had developed in her arm and neck. Dr. Finkle accepted Mrs. Tryon as a referred patient and in treating her injuries utilized the facilities of the Independence Sanitarium and Hospital to administer her a series of neck traction treatments. Following the 1965 accident and injury to her left shoulder, Mrs. Tryon was again examined and diagnosed by Dr. Finkle *at the Independence Sanitarium and Hospital.* At that time Dr. Finkle evaluated X-rays and a report of X-ray findings (Plaintiffs' Exhibit No. 4) submitted by the hospital's Department of Radiology, signed by Kenneth C. Hollweg, M. D., and directed to the "Service of * * * R. H. Finkle * * * (and other physicians named) * * * M. D." Under these circumstances clearly showing that the facilities of the Independence Sanitarium and Hospital were available to Dr. Finkle for his professional use in examination and treatment of injured persons, the only reasonable inference to be drawn is that he was recognized by the administrative authority of the hospital as a fully qualified physician and that he was a member of the hospital's duly accredited medical staff. It is inconceivable that Dr. Finkle would have been permitted access to and use of the hospital and its services in the treatment of patients if he were not a thoroughly trained, experienced, reputable and qualified physician.

Dr. Finkle's qualifications as a medical expert are further attested by the persuasive circumstance that when it was decided by Dr. Link that his patient needed the services of an orthopedic specialist he chose Dr. Finkle as such specialist and directed her into his care. It is incredible that Dr. Link would have been so indifferent to the welfare of his patient as to have delivered her into unskilled, unqualified hands. We choose instead to believe that Dr. Link, whose medical skill and integrity as a physician are attested by his medical license,

exercised a high degree of discriminate care to select for Mrs. Tryon an orthopedic specialist of general ability, training and qualifications conforming to the standards of the medical profession to which he himself belonged as a reputable, licensed member in good standing. This is to say that we believe the reference of Mrs. Tryon by Dr. Link, the "M. D.", to Dr. Finkle, as a selected "orthopedic specialist", further warrants the inference that Dr. Finkle is also an "M. D.".

In Allen v. Missouri Public Service Company, supra, the Supreme Court considered the question whether a doctor was sufficiently qualified to make a medical report that would be eligible for admission in evidence as a hospital record under the Uniform Business Records Act. During the trial of that case an exhibit was produced and identified by the medical records librarian of a hospital as being a part of the medical records pertaining to an injured plaintiff. The record was further identified as signed by "a Doctor Ruby". Concerning Dr. Ruby the librarian testified that he was a resident physician at the hospital at the time in question but that he had since left and gone west. On the basis of those facts the Supreme Court ruled as follows: "There was direct testimony that the doctor who wrote this entry was, at the time, a resident physician of the hospital; from this we may presume his qualifications."

So it is in this case. We presume the existence of Dr. Finkle's qualifications as a medical expert from the evidence before us. Consequently we are not in agreement with defendant that the trial court took the proper course of action by excluding Dr. Finkle's medical records on the grounds he was not a qualified medical expert. The trial court's error in so doing was prejudicial, inasmuch as that action was an arbitrary curtailment of plaintiffs' right to introduce testimony on a vital issue—the nature, extent and prognosis of her injuries. The opinion in Allen v. Missouri Public Service Company, supra, specifically indicates the parts of a duly authenticated and qualified hospital record that should be admissible, subject to specific objections on substantive grounds, listed as follows (but not limited thereto): "the physical examination findings, the patient's symptoms and complaints, treatment and progress records, diagnoses by those qualified to make them, the result of analyses and laboratory tests, X-rays, the behavior of the patient, and those parts of the patient's history inherently necessary (or at least helpful) to the observation, diagnosis and treatment of the patient". Those were the entitlements of which plaintiffs were deprived to their prejudice by the trial court's error in excluding the medical records of Dr. Finkle.

Plaintiffs' second assignment is also a complaint that the trial court erred by excluding evidence they were entitled to introduce. The point involves two witnesses. During examination of Thomas Sugg, the police officer, plaintiffs' counsel undertook to elicit testimony from him to the effect that when he interviewed Mrs. Tryon at the hospital after the accident she made complaints of present pain and suffering in his presence on that occasion and also that he was able to observe that she was in pain. The trial court denied plaintiffs' formal offer to prove those facts by the witness on the ground that such testimony would be self serving. Plaintiffs also produced as a witness their neighbor, Joyce Wingate Peoples, who testified that on one occasion following the accident when she was in the Tryon home at eleven o'clock in the morning Mrs. Tryon was in bed and was crying. Plaintiffs' counsel sought further to show by Mrs. Peoples that Mrs. Tryon was also making complaints of present suffering, pain and discomfort on that occasion in the presence of the witness. Again the trial court rejected plaintiffs' offer to prove those facts on the ground "they are self serving and would be hearsay".

Defendant concedes that evidence of complaints of present pain and suffering by plaintiff Elsie Fern Tryon made in the presence of witnesses Thomas Sugg and

Joyce Wingate Peoples should have been admitted. Exclusion of that evidence must necessarily be held to have constituted error. Missouri courts have long observed the rule that expressions and complaints of present pain made by an injured person at the time the pain is being suffered are to be received as original evidence and are not to be rejected as hearsay, mere opinion or non res gestae, or on the ground they are self serving, if directed to a present, existing condition so as to be the natural and spontaneous expression of the person's feelings at the time in question. Mo.D., Evidence, ▮▮▮▮▮▮▮ It is also well settled that "a non-expert witness may give his opinion as to the apparent health of a person whom he has had an opportunity to observe". Steffen v. Southwestern Bell Telephone Co., 331 Mo. 574, 56 S.W.2d 47, 12A Mo.D., Evidence, ▮▮▮▮▮

▮▮▮ Defendant undertakes to avoid her confession of error in the exclusion of the testimony of witnesses Sugg and Peoples relative to Mrs. Tryon's complaints of pain by contending that the error was harmless because "such evidence was cumulative at most". Defendant suggests there is other evidence to establish the same facts witnesses Sugg and Peoples would have testified to, namely, the testimony of Mrs. Tryon herself, Mr. Tryon, Drs. Link and Meise and a hospital record which was read to the jury. There is no necessity that this secondary question raised by defendant be decided, since the prejudicial error resulting from the trial court's refusal to admit material portions of Dr. Finkle's medical records in evidence and other error to be noted constitute sufficient reason to reverse the judgment and remand the cause for a new trial. Furthermore, as an appellate court, we deem it the better course of action to refrain from non-essential decision of a question that is properly addressable to the trial court in the first instance. It is a fundamental rule of trial procedure that the trial court is vested with discretion to admit or reject cumulative evidence, and that the exercise of such discretion is not

reviewable on appeal in the absence of its abuse. See: Neeley v. Kansas City Public Service Co., 241 Mo.App. 1244, 252 S.W.2d 88; 27 Mo.D., Trial, ▮▮▮▮ The issue addressed to this court has never been presented to the trial court and there is no certainty the question will arise again when the case is retried or that it will be presented in the same form. These comments are not to be understood as an expression of this court that the testimony of witnesses Sugg and Peoples would have been cumulative. In contending that the trial court's error in excluding that testimony was harmless, defendant cites and relies upon Steffen v. Southwestern Bell Telephone Co., supra, where the trial court exercised its discretion to exclude evidence as cumulative. Two other Missouri cases may be relevant to the question if it re-arises, to-wit: Dorn v. St. Louis Public Service Co., Mo.App., 250 S.W. 2d 859, and Grath v. Mound City Roofing Tile Co., 121 Mo.App. 245, 98 S.W. 812. Both cases are authority to the effect that evidence should not be rejected as cumulative when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence introduced by the respective parties.

Still another complaint of error arises from the trial court's exclusion of evidence tendered by plaintiffs' counsel. During the testimony of Mrs. Tryon, offer was made to prove on behalf of plaintiff Walter Tryon, by the testimony of both plaintiffs, that Walter Tryon was in fact the owner of the business referred to as the Rapid Car Wash although the business was conducted jointly between them, that there were no partnership income tax returns, and that while Mrs. Tryon was unable to work at the Rapid Car Wash from October 30th (1963) to April 1st (1964), it was necessary for Mr. Tryon to employ replacement help to perform her duties at a cost of approximately $2,000.00. Counsel stated that the offer was made as "an aid to arriving at the value of her services in connection with her helping in his employment". Although

not made a part of this offer of proof, additional facts had been provisionally stated by plaintiffs' counsel at a conference between counsel and the court, prior to opening statements, to the effect that Mrs. Tryon was not paid any salary for her services, that there was no actual partnership, and that plaintiffs had a joint bank account in which proceeds from the business were deposited and which was subject to withdrawal by both spouses. Defendant objected to the offer on grounds it was "speculative", that the cost of replacement help was not a proper measure of lost income in the wife's case "since there is no evidence she was paid a salary", and that, as to the husband's case, the offer was improper because "it is not the normal service of the wife". The objection was sustained and the offer denied.

It is submitted on behalf of plaintiff husband that he was entitled to the benefit of the labor his wife performed in connection with his business, that his loss of the value of such labor resulting from her wrongful injury was a proper element of his claim for loss of her services, and that he was therefore entitled to introduce evidence of the cost of replacement help while she was unable to work, as tending to prove the value of her services that were lost to him. Defendant argues that a husband's claim for loss of his wife's services is restricted to "normal household duties and society, companionship and consortium", that the claim does not include loss of services rendered by the wife outside the home as a wage earner, and that consequently in this case Walter Tryon may not recover for the loss of his wife's services rendered in the conduct of his car wash business operated by their joint endeavor.

To resolve the question thus presented we look to the common law as it has been modified by the statutes pertaining to the reciprocal rights and duties of a husband and wife. Under the common law it was and still remains the prime and paramount duty of the husband to support and maintain his wife and family. State ex rel. George v. Mitchell, Mo.App., 230 S.W.2d 116, 120, and Wilt v. Moody, Mo., 254 S.W. 2d 15, 19. This duty has not been lessened by legislation. In re Estate of Wood, 288 Mo. 588, 232 S.W. 671. A correlative obligation imposed upon the wife is the duty to render service to her husband. Eisminger v. Stanton, 129 Mo.App. 403, 107 S.W. 460. The common law, under which a wife's earnings during coverture vested absolutely in her husband, was modified by statute in 1875 to provide that "Any personal property, including rights in action, belonging to any woman at her marriage, or which may have come to her during coverture by gift, bequest, or inheritance, or by purchase with her separate money or means, or be due as the wages of her separate labor, or have grown out of any violation of her personal rights, shall, together with all income, increase and profits thereof, be and remain her separate property and under her sole control, and shall not be liable to be taken by any process of law for the debts of her husband". Laws of Missouri 1875, pp. 61, 62. The provisions of the 1875 statute as quoted above are, in exact and complete text, contained in present Section 451.250 VAMS. Obviously, it was the purpose of these statutes to secure to a married woman the wages of her "separate labor" as her "separate property", and to exclude her husband from any right therein. This leads us to say that if the work performed by Mrs. Tryon in aid of her husband's business was her "separate labor", Mr. Tryon is not entitled to recover any loss of those particular services. On the other hand, if the work she performed in assisting her husband conduct his business was not "separate labor" as contemplated by the statute, the loss of those services occasioned by defendant's wrong, would be recoverable by Mr. Tryon.

The nature, scope and effect of the above quoted statute enacted in 1875 (which presently exists as Section 451.250 VAMS) were considered and delineated by the Supreme Court in Plummer v. Trost, 81 Mo. 425, where a wife labored in conjunction with

her husband in fulfilling the latter's contract with the owner of a farm to operate it on a profit sharing basis. By their joint efforts they farmed the land for three years and raised valuable crops but nothing was ever paid to either spouse for their labor. Thereafter the husband died and the wife undertook, as a plaintiff, to recover the value of her services devoted to the farming operation. In denying her a recovery the court observed that while the 1875 statute gives the wife her wages, "it is to be observed that it is limited to the wages 'of her separate labor' ", and stated that "Under similar statutes allowing the wife her earnings, the accepted construction is, that when her labor is performed on account of, or in connection with the husband, or is bestowed on his business, or where there is nothing in the terms or circumstances of the contract to indicate an intention or purpose to concede to her the fruit of the given labor, the statute does not apply". Continuing, the court further said:

> "While the husband may, by his assent, concede to the wife the wages of her labor, so that she may hold it even against his creditors, yet where the work and business are carried on by husband and wife in co-operation, the labor of the husband being united with that of the wife, the business and its proceeds will be regarded as belonging to the husband. It will be subject to his debts and, on his death, pass to his administrator. * * * Where the husband and wife are living together and mutually employed in providing a support for themselves and children, and there is neither any express agreement, nor anything to indicate at the time an intention on her part to separate her earnings, and nothing to indicate an assent of the husband thereto, the right of property and action therefor, belong to the husband."

The foregoing principles enunciated by the Supreme Court were followed and reaffirmed by this court in Plummer v. City of Milan, 70 Mo.App. 598, where a wife who had been injured by a sidewalk fall testified as follows: "Am going on forty years old. Am married. Have been married about twenty years. Am living with my husband. I have got nine children. The oldest is eighteen years old. The youngest is four months old. Besides keeping house for my husband, I help if I can get any sewing to do, sewing for anybody. Something like that, to help support the family. My husband helps to make a living for the family and I keep house for him". Under that testimony we held that the injured wife did not intend that the income from her sewing go to her separate or individual use but that "she did it (the sewing) as an aid and service to the husband in the support of the family", and that consequently the loss of such income was a loss to the husband, not to the wife. In the opinion attention was directed to statute Section 6864, R.S. 1889 (present Section 451.290 VAMS), which was enacted subsequent to the decision of Plummer v. Trost, supra, and by which a wife was empowered "to carry on and transact business on her own account". With reference to that provision we said that it did not have the effect to compel her to transact "on her own account" whatever business she may do and that "She can do so, but she need not do so". It was our conclusion that " * * * (W)hen her labor is intended to aid the husband in the support of the family, it will be considered labor for the husband; and for the loss of which he would be entitled to recover". And, in Blair v. Chicago & Alton Railroad Co., 89 Mo. 334, 1 S.W. 367, the Supreme Court again considered the question whether work performed for the husband outside of household duties for the family was "separate" labor within the meaning of the statute. The court in that case upheld the husband's right to recover for loss of his wife's services "as milliner in conducting his millinery store".

We have duly considered cases cited and relied upon by defendant, but with the exception of Kirkpatrick v. Metropolitan Street Railway Co., 129 Mo.App. 524, 107 S.W. 1025, we find none which qualifies or

conflicts with Plummer v. Trost, supra. The Kirkpatrick case, decided by this court in 1907, is in direct conflict with Plummer v. Trost, supra, in that by a divided opinion our earlier brothers held that work by a wife as a clerk in her husband's store would be considered as her separate labor as contemplated by the statute we have previously noticed. For that reason the court reversed a judgment awarding the plaintiff husband damages for loss of such services resulting from an injury to his wife. Pursuant to a vigorous dissenting opinion filed by Judge Ellison, the case was transferred to the Supreme Court which reversed the judgment on grounds other than that assigned by this court for so doing, and without notice or discussion of the question whether the wife's services to plaintiff husband were her separate labor. See Kirkpatrick v. Metropolitan Street Ry. Co., 211 Mo. 68, 109 S.W. 682. We therefore regard the case of Plummer v. Trost, supported as it is by Plummer v. City of Milan and Blair v. Chicago & Alton Railroad Co., as controlling authority on the instant question, and reject the Kirkpatrick case because it is in conflict with the Supreme Court's decision. Applying the legal pronouncements laid down in these cases to the facts in the record before us, we can conclude only that Mrs. Tryon did not intend that the work she bestowed on behalf of her husband in the operation of his business should be considered as her separate labor. There is nothing shown to indicate any intention on her part to separate the earnings of her labor from those of her husband or to claim any separate benefit therefrom, or that her employment in joint effort with her husband in his business was designed for any purpose other than to assist in providing support for their family. We rule accordingly that the right of action in question belongs to her husband and that the trial court prejudicially erred in refusing to admit evidence of his expenditures for replacement help on the ground he was not entitled to recover therefor.

In reaching the immediately foregoing conclusions we have duly considered argument on behalf of defendant that evidence of the cost of replacement help was properly excluded because it was not a "proper measure of damage in this case" for the reason it was "completely speculative". We find no merit in this argument. The evidence in question was not offered to establish a legal measure of Walter Tryon's damages, but only to be considered, subject to proof of the necessity and reasonableness of the expenditures, "as an aid to arriving at the value of her (Mrs. Tryon's) services in connection with her helping in his employment". It is the generally accepted rule that "evidence of the cost of hiring a substitute during the incapacity of the injured person is admissible, and may be considered by the jury in assessing damages". 37 A.L.R. 2d 366, Anno.: Damages—Cost of Hiring Substitute. As stated in 22 Am.Jur.2d, Sec. 163, p. 233, "The cost of hiring a substitute during the incapacity of an injured person is admissible in evidence and may be considered by the jury in awarding damages". This rule is recognized by and followed by Missouri courts. In Liles v. Associated Transports, 359 Mo. 87, 220 S.W.2d 36, where an injured plaintiff who owned and operated a business necessarily hired replacement help while he was confined and unable to work, the Supreme Court said, "The cost of hiring those substitutes was some evidence of the value of his loss of time". Cases cited and relied upon by defendant are distinguished by the factual situations therein presented.

Plaintiffs present one more point: that the trial court erred in overruling their motion for a new trial because the verdicts are so grossly inadequate as to demonstrate "they were the result of bias, passion, prejudice or partiality on the part of the jury". There is no need to determine that question, inasmuch as the prejudicial errors previously noted are sufficient reason to set aside the judgment.

Accordingly, the judgment is reversed and the cause remanded for a new trial.

All concur.