Mary DENNIS, Plaintiff-Respondent,

v.

SEARS, ROEBUCK & COMPANY,
Defendant-Appellant.

No. 25402.

Kansas City Court of Appeals,
Missouri.

Dec. 7, 1970.

Karl F. Schmidt, John E. Morrison, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, for appellant.

Lantz Welch, Martha Sperry Hickman, Quinn, Peebles & Hickman, Kansas City, for respondent.

JAMES W. BROADDUS, Special Commissioner.

This is an appeal from a verdict and judgment for personal injuries in favor of plaintiff in the amount of $8,750.

Mary Dennis brought the instant action against Sears, Roebuck and Company for damages allegedly sustained when she claims to have fallen on a "down" escalator at the Sears Store at 15th & Cleveland, Kansas City, Missouri, on or about March 2, 1967. Mary Dennis was 59 years of age at the time of this accident, but had not progressed mentally beyond the age of 10 or 12 years.

At the time of the accident Mary Dennis was with Kenneth Johnson and Betty Johnson doing some shopping. Mrs. Johnson is the step-daughter of Alta Busby, Miss Dennis' sister. Kenneth Johnson was the first of these three people to get on the escalator. As he did so, he looked down at the escalator, noticed that it wasn't running smoothly, that it just "lugged along." He has been on this same escalator since the date of the accident, at which time he noticed that it was moving in the same manner, but he did not call this movement to the attention of anyone and had no difficulty in riding said escalator. He did not think twice before getting on on March 2, 1967, was not alarmed at the movement of the escalator and had no trouble keeping his balance. Betty Johnson did not notice anything unusual about the movement of the escalator when her husband got on it, nor that he had any difficulty getting on it. Mr. Johnson did not call the movement of the escalator to the attention of anyone at that time, including his wife or anyone at Sears. In fact, he did not mention the movement of the escalator to Mr. Orr or to anyone at Sears after the accident, and did not mention it to anyone until his deposition was taken on July 25, 1968. Mr. Johnson had never mentioned the movement of the escalator to Miss Dennis.

Mr. Johnson did not know what caused Miss Dennis to fall, in fact, he did not see her fall. He did not notice any foreign substance on the escalator.

Mrs. Betty Johnson got on the same escalator two to six steps behind her husband. At that time she did not notice anything unusual about the escalator and does not remember any unusual movement, nor did she have any difficulty keeping her balance on the escalator. She also did not notice any foreign substance on the escalator nor anything that caused her to feel that it was dangerous or hazardous.

Miss Dennis got on the escalator after Mrs. Johnson and was some five or six steps behind Mr. Johnson. At the time she got on she was not paying any attention to the movement of the escalator, but was watching people make vases on the sales floor at the top of the escalator and got on only when Mrs. Johnson asked her to do so. Mr. Johnson did not say anything to Miss Dennis about the movement of the escalator at the time she started to get on, nor did he hear Mrs. Johnson say anything to her about the movement of the escalator.

As Miss Dennis was riding down on the escalator, she felt a little funny jerk, a short jerk of the step of the escalator, causing her to fall. However, the escalator kept running after she fell. Mr. Johnson did not see Miss Dennis fall, but it was his wife that called his attention to the fact that she had fallen. When Mr. Johnson first saw Miss Dennis she was bent over with the left side of her coat caught between the left side of the moving steps and the stationary side panel. However, the escalator was still moving at that time.

Mr. Johnson went back up the escalator to help Miss Dennis after his wife called his attention to her fall. He helped her get up, got her coat free when they reached the bottom and lifted Miss Dennis off the escalator at the bottom. At that time he noticed that her knee was apparently injured. A saleslady brought a chair from the shoe department, which was next to the escalator, for Miss Dennis to sit on. Mr. Johnson put Miss Dennis in the chair. The saleslady called Mr. James Orr, security manager for this Sears store, who ordered a wheel chair for Miss Dennis. Miss Dennis was taken to the nurse's station in this Sears store. The nurse wrapped her leg and suggested that she go to the hospital, as there was a possibility that her leg was broken.

After going to the hospital, the nurse attempted to get in touch with Mrs. Busby's doctor, but was unsuccessful. Mr. Orr said that it would be quicker to take Miss Dennis to the hospital in his own car rather than an ambulance. Persons injured in this Sears store are generally taken to Research Hospital. Sears has a doctor on the staff at Research Hospital. Mr. Orr took Miss Dennis to the emergency room at Research Hospital and turned her over to the people there. Mr. Johnson followed Mr. Orr, Miss Dennis and Mrs. Johnson to the hospital in his own car.

Permission was given for treatment of Miss Dennis at the hospital by Mrs. Busby.

At the emergency room, Miss Dennis' leg was operated on and was put in a cast.

Mr. Orr told Miss Dennis, Mr. and Mrs. Johnson and Mrs. Busby that Sears would pay for first day first-aid expenses. No one at Sears has ever said that Sears would pay for all of the hospital and medical expenses of Miss Dennis. Apparently, the nurse at the hospital said Sears would pay for the expenses, but she was not an employee of Sears and Mr. Orr did not tell anyone that this was true. The bills were paid, but not by Sears.

The two escalators at the Sears store at 15th & Cleveland were built and installed by Otis Elevator Company. Sears had a contract with Otis for the maintenance of such escalators. Mr. William Cox, District Manager of Otis Elevator Company, inspected the escalator in question on March 3, 1967, the day following the accident, and found that it was working properly and that there were no defective, worn or broken parts. At that time he noticed that the steps did not jerk violently. Mr. Cox also stated that no repairs were made to the escalator at this time, though such repairs would have been made if they had been needed as this was required by the maintenance contract between Sears and Otis.

Defendant's first contention is that the court erred in allowing plaintiff to amend her petition at the close of all the evidence by replacing the words "jerked violently" in paragraph 2 thereof with the allegation that defendant allowed and caused the escalator to "jerk in an unusual manner."

The testimony with respect to the movement of the escalator was given by plaintiff and Mr. Johnson. Plaintiff testified "it jerked me and I fell down"; "it jerked me". On cross-examination she answered affirmatively in response to the question: "As you described it, you said it was a little funny jerk, a little funny jerk was the way you described it, wasn't it, a short jerk?"

Mr. Johnson gave the following answers to questions concerning the movement of the escalator: "It didn't seem to run real smooth—it just kind of lugged along or something * * * it wasn't a smooth run * * *. It just seemed like it wasn't smooth * * * more of a jerk."

It is the well established rule that a court should be liberal in permitting amendments to pleadings and whether a particular amendment should be permitted is primarily within the sound judicial discretion of the trial judge whose action will not be disturbed where there is no showing that such discretion has been palpably abused. Hughes v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 360, 363.

It is clear that the point is not well taken since the evidence supported the amendment and it was neither untimely nor prejudicial.

Defendant's next point is that it was error to submit Instruction No. 2 offered by plaintiff as it did not conform to the pleadings as finally amended and was not supported by the evidence.

■ The complaint is directed at that portion of the instruction which reads: "Second, the escalator made a sudden and unusual jerk, * * *."

The questioned instruction uses the exact language of MAI 31.02(2). As is to be seen MAI 31.02(2) permits a choice of the word "jerk" from the bracketed and suggested words "stop", "swerve", "jerk", "lurch". There is no choice of words from which "sudden" can be excluded.

As we have pointed out, the description of the movement of the escalator by plaintiff and her witnesses uses the words "unusual", "funny", "jerk", "it wasn't smooth." "Unusual" means "not usual or common; strange; rare; exceptional." "Jerk" means "to pull at, twist, push, thrust, or throw with a sudden, sharp movement"; or as a noun, "a sharp abrupt movement; quick pull, twist, push." (Webster's New World Dictionary, 1956.)

An example of the recognition by our courts that "unusual" and "sudden" or "sudden" and "jerk" have similar meanings appears in the case of White v. St. Louis Public Service Company, 364 Mo. 111, 259 S.W.2d 795, wherein the testimony that the operation of the street car "snatched me down", "you mean jerked up?" "Sure, pulled it up," supported the instruction "sudden, violent jerk in unusual manner."

Another example is the case of Laycock v. United Rep. Co., of St. Louis, 290 Mo. 344, 235 S.W. 91, where an instruction using the words "sudden and violent jerk" was held equivalent to unusual or extraordinary movement.

We are of the opinion that the contention lacks merit.

Defendant also contends that the trial court erred in allowing plaintiff to read that portion of the deposition of Betty Johnson reading as follows: " * * * and they suggested Research Hospital, that that was the hospital they used and that their doctor was on staff there * * *."

Defendant says the statement was hearsay, and that "the name, position and authority of the person to make such alleged statement on behalf of Sears was not established." Defendant asserts that such statement inferred that it admitted liability by arranging for the hospitalization and doctor's care of the plaintiff, and, as a result defendant was highly prejudiced.

■ The statement was merely cumulative and we fail to see how defendant was prejudiced. There was similar testimony throughout the trial, both before and after the witness Betty Johnson testified. Defendant in its opening statement said, "Mr. Orr did take her out to the emergency room at Research Hospital where her treatment commenced. And when he took her out there he turned her over to Research Hospital." Plaintiff testified on direct examination (without objection) in response to the question, "What did she do about getting you to a hospital?" that

"she (the nurse) got the man—whatever they call him, and he didn't call no ambulance, we went in his car, me and Betty did * * * and he entered me in the hospital up there." Plaintiff also testified without objection in reply to the question, "Did anyone out there at Sears make arrangements for you to go anywhere?" She answered, "That—whatever you call him, the house detective picked me up and put me in the car and he entered me in the hospital." Alta Busby, plaintiff's sister, testified (prior to the questioned deposition of Betty Johnson) without objection, "and then when I called back to tell them to bring her on to the hospital and he would meet her at the hospital, why he told me that Sears had taken her to Research Hospital and she would see Dr. Fitzgerald there." Exhibit 5, a letter from Research Hospital was received in evidence without objection and was quoted as follows: "We have just been advised by the local Sears, Roebuck office that there will be no payment made for your recent hospital admission. * * *" Mr. Orr who was identified during the voir dire as Customer Service Manager and as the Security Manager at the time of the incident testified as defendant's witness that he was a Security Manager at the time of the incident; that he took her to the emergency room in his car; that Sears normally would take anyone that was required to be taken to Research Hospital; that he took her directly to the emergency room and turned her over to the people there; that he explained to her and to Mr. and Mrs. Johnson that Sears would be responsible for the "first day first-aid expenses" and that he later told Mrs. Busby the same thing and that Sears did not pay the doctor or hospital bill.

As stated in the case of Tryon v. Casey, Mo.App., 416 S.W.2d 252, 259:

"It is a fundamental rule of trial procedure that the trial court is vested with discretion to admit or reject cumulative evidence, and that the exercise of such discretion is not reviewable on appeal in the absence of its abuse."

Defendant next complains of the failure of the trial court to declare a mistrial on account of a statement made by plaintiff's counsel in his closing argument.

The transcript recites that before the sentence was completed defendant's counsel stated: "At this time, Your Honor, we move for a discharge of the jury." Plaintiff's counsel: "I am just answering his arguments. He opened up the subject." Defendant's counsel: "I think the jury should be told in stronger terms that they should disregard his statements." The Court: "I will tell the jury to decide the case on the instructions before them."

In the case of Riley v. St. Louis Public Service Company, Mo.App., 245 S.W.2d 666, 673, it is said:

"By reason of the utter impossibility of regulating the course of argument with absolute precision, it has always been recognized that the matter is one to be left largely to the discretion of the trial court, reviewable only for abuse."

■ There was no abuse of discretion shown here and we rule the contention against defendant.

Finally the defendant contends that the court erred in allowing plaintiff to testify as the evidence shows that she was an incompetent witness.

■ Plaintiff being over the age of ten there was no duty incumbent upon plaintiff to first establish her competency. However, after four or five preliminary questions the defendant objected to her testimony until her competency was established in view of plaintiff's opening statement that she was retarded. The Court sustained the objection and commented that the Court did not think that competency had been established. Plaintiff's counsel then proceeded in the presence of the jury (there being no request that this examination be held outside their presence) to ask

**330**

plaintiff some questions concerning her understanding of the oath and obligation to speak the truth and although the witness answered that she did not know that God would punish her if she did not tell the truth, she did answer that she knew what it meant to swear to tell the truth and explained her understanding of the meaning of the oath. The defense did not thereafter make any further objection to her competency and plaintiff being satisfied that her competency had been sufficiently established, proceeded with the examination. As noted in defendant's brief, other witnesses were questioned as to plaintiff's mental capacity. Mrs. Sides commented that she was retarded. Plaintiff testified that she went to school through her first year of high school. Mrs. Busby, her sister, testified at length concerning her mentality, stating that she has in some ways the mentality of a child of ten or twelve while in other ways she handles the situation very well. She pointed to a time earlier in plaintiff's life when plaintiff's mother was injured and plaintiff was able to handle her mother as an invalid except for the "money side."

In Missouri a person who has been adjudicated to be incompetent (plaintiff was not so adjudicated) may be permitted to testify. As stated by our Supreme Court in the case of State v. Herring, 268 Mo. 514, 188 S.W. 169, 173:

> The "law now is that the lunatic may be sworn and may testify as a witness, provided, upon examination by the Court (who is the sole judge of his competency, subject to review on appeal for an abuse of discretion) he shows that he understands the nature of an oath and that he possesses mental capacity sufficient to observe and recollect and narrate the things he saw or heard."

The trial judge did not abuse his discretion.

We find no prejudicial error in the transcript. Your Special Commissioner recommends that the judgment should be affirmed.

## PER CURIAM.

The foregoing opinion by JAMES W. BROADDUS, Special Commissioner, is hereby adopted as the opinion of the Court and the judgment is affirmed. All concur.